**Timothy RAWLINS,**

v.

**UNITED STATES of America.**

No. 1:96–CV–436.

United States District Court,
E.D. Texas,
Beaumont Division.

June 28, 1999.

George Michael Jamail, Reaud Morgan & Quinn, Beaumont, TX, Bryan Adam Terrell, Weller, Green, McGown & Toups, Beaumont, Texas, for plaintiff.

Louis M. Scofield, Jr., Mehaffy & Weber, Beaumont, TX, for intervenor, Signal Mutual Indemnity Association.

Peter G. Myer, U.S. Department of Justice, Torts Branch Civil Division, Washington, DC, Andrea Hedrick Parker, Assistant U.S. Attorney, Beaumont, TX, for defendant United States of America.

Innes Mackillop, Brown Sims Wise & White, Houston, TX, for third party defendant Fairway Terminal Corporation.

## MEMORANDUM OPINION

COBB, District Judge.

This suit is brought pursuant to the waiver of sovereign immunity contained in the Public Vessels Act, 46 U.S.C.App. §§ 781–790, which incorporates, at 46 U.S.C.App. § 782, the provisions of the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–752, insofar as they are not inconsistent with the express language of the Public Vessels Act. Jurisdiction over Rawlins' claims against the United States as cargo owner and the United States' claims against Fairway exists pursuant to the Suits in Admiralty Act and the court's admiralty and maritime jurisdiction. 28 U.S.C. § 1333. Further, the court has jurisdiction over any general maritime law claims pursuant to its admiralty and maritime jurisdiction, 28 U.S.C. § 1333.

In this bench trial, the court heard testimony from seven witnesses, and 12 by depositions. In addition, with the agreement of the parties, the court had the opportunity to view the vessel, accompanied by all attorneys except for one of the

plaintiff's attorneys, together with the court reporter, in the event any questions were asked by the court of any witnesses. No one was interrogated by the court or counsel.

### Factual Background

On December 29, 1994, longshoreman Timothy Rawlins was working at the Port of Beaumont, Texas, for Fairway Terminals Corporation, the stevedore which contracted with the United States Department of Defense to load various heavy equipment on the CAPE VINCENT, owned by the Maritime Administration, an agency of the United States government (MARAD), in the service of the United States of America for transport to Haiti for humanitarian purposes following the crisis after the civil unrest in that country in late 1994.

Time was apparently of the essence, and a tremendous effort was being made by the United States to alleviate the civil unrest and the human suffering of the Haitian people. Thus, the United States government was loading generators, heavy trucks, devices for producing potable water, and other equipment for transport.

The CAPE VINCENT is not a United States Navy ship, but is a transport owned by MARAD for overseas transport of military equipment. It is crewed by a civilian crew, not by United States service men or women.

The CAPE VINCENT is approximately 700' in length, and over 100' in width, with steel beams on the partially open decks for securing all manner of heavy and light equipment and vehicles, ranging from tanks, jeeps, humvees, "deuce and a half" transport trucks, and 18–wheeled vehicles.

Fairway's contract with the government was with the Military Traffic Management Command under the aegis Department of Defense. The contract covered the cargo and its loading aboard the ship. It did not cover any conditions found aboard the ship, however.

December 29, 1994, was a cloudy cold day with misting or drizzling rain. The "weather" deck was the top deck of the ship, and was wet, with precipitation and, in some spots, oil or hydraulic fluid was also on the weather deck. Rawlins noticed oil on the deck and reported it to his immediate superior, Winfree, as he had been instructed to do. Rawlins and at least two other longshoremen saw their foreman report it to members of the crew. No one put "Speedy Dry" on the spot Rawlins saw. Although either the ship's crew was supposed to do this, as was the stevedore, Fairway. Fairway had a "Speedy Dry" substance ashore, but the ship had it available on the very weather deck where the oil existed.

No one used this substance until after Rawlins slipped and fell on the oily, watery deck, severely injuring his left knee. He found oil and water on his coveralls after his fall. As can be imagined, the weather deck was covered with heavy trucks—18–wheelers, and other U.S. Army vehicles. Other longshoremen drove the vehicles onto the ship and placed them on the deck according to the Army's civilian employee's "pre-stow" plan. Once in place, Rawlins and others secured the various vehicles to "pad eyes" built into the steel surface of the deck, by using chains from the pad eyes to the vehicles.

On occasion, either ship's crewman or Army personnel required chained and secured equipment to be loosened and moved to accommodate the total equipment to be shipped. The lanes and paths between vehicles was very small, or "tight." While one of the large trucks was being moved, Rawlins stepped back out of its way, placed his left foot in the oily wet patch, and he fell, hearing a loud pop or crunch in his leg when he fell to the deck. This sound was also heard by others. His left knee was subject to immediate swelling which was seen by other longshoremen.

Rawlins reported his injury, and his supervisor told him to use a fork-lift, or perform some other less onerous duties

the remainder of December 29th, and if his leg still hurt on the 30th, the supervisor would make a formal report of the injury, and send him to the local hospital emergency room for treatment.

Rawlins' initial diagnosis was thought to have been cartilage damage to the medial meniscus in his left knee. Thereafter, following two orthoscopic operations on his left knee, he was finally diagnosed with a condition of chondromalacia, which is the softening and "cratering" of the distal end of his left femur which required surgical intervention. He has a functional loss of 15% to 25% of his left leg, according to Dr. Martin Haig, an orthopedic surgeon employed by Fairway's insurance carrier. His painful knee has resulted in his never being physically able to do the normal tasks of heavy work, such as walking, standing, lifting, climbing, or any prolonged activity involving putting weight on his left leg. He has sustained a certain amount of atrophy in the left leg in the quadriceps area, and has occasionally had pain in the right leg because of his overuse of it to ameliorate his left leg and knee pain.

Rawlins was sporadically out of work for the better part of two years, and finally obtained employment as a warehouse supervisor at the Federal Correctional Center of the Bureau of Prisons near Beaumont, Texas. The total of his medical bills to date of trial has been $23,484.14, and he was paid Longshoremen and Harbor Workers' benefits of $23,158.56. Signal Mutual Indemnity Association, Ltd., the Longshoremen and Harbor Workers Compensation Act carrier, has intervened to recover under its subrogation rights.

### Liability Analysis

Rawlins originally brought suit on two theories: 1) a federal tort claims action against the United States as owner of the cargo which allegedly was negligent in allowing oil and grease to leak on the weather deck of the CAPE VINCENT during loading, and failing to remove it, proximately causing his fall, ensuing injuries and damages; and 2) against the United States (MARAD) as a maritime tort caused by the condition of the weather deck of the ship, because the crew of the CAPE VINCENT were actually aware of the oil on the deck, mixed with water (or in the exercise of ordinary care should have been aware of the hazard), and failing to remove the substance or take some effort to use the powder "Speedy Dry" to render the hazard harmless.

The Federal Tort Claims Act was not tried because this court previously granted a partial summary judgment to the United States on this asserted cause of action.

The United States (MARAD) is liable to the longshoreman only under the holding in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). It can only be liable if it had not turned the ship completely over to the stevedore, Fairway, for loading. Thus, the primary issue for the court to decide is whether or not MARAD, and its civilian crew, had turned the CAPE VINCENT over to Fairway, retaining no control over the ship while Fairway was performing its duties as stevedore. The court must make this determination from the evidence produced by the parties in the bench trial,

There were numerous witnesses, both live, and by deposition.

Curt Connally, the CAPE VINCENT's first mate, testified by deposition offered by both Rawlins and Fairway:

Q. What was your position aboard the MV CAPE VINCENT in December of 1994?

A. I was chief mate.

Q. And what duties did that position entail? Describe your duties as chief mate.

A. Chief mate basically is in charge of the deck, oversees all the loading, the lashing, the maintenance, runs the deck crew and also stands the navigational watch.

Q. What responsibility do you have for the cleanliness of the cargo spaces?

A. That's totally my responsibility.

Q. Could you describe your routine or the routine of those that reported to you for inspecting the cargo spaces and making sure they stayed clean?

A. Well, during any loading situation, what would happen would be—whoever would be the mate on watch— if it was 4:00 to 8:00, that would be myself, and the second and third mate are 12:00 to 4:00, 8:00 to 12:00, plus the day worker, the boatswain, and the AB on watch, they would—I would give them the routine for the loading of the cargo, in other words, generally how it was supposed to go. And being that ventilation had to be on as to each section was loaded, stevedores came in and lashed it. And, so, we are continually watching these sections as these sections were lashed, and then they would report to me as to what the final lashing would look like— and then also if there is any problems with the vehicles, wouldn't start or any oil spills or anything like that, well, then, that would be brought to my attention. Usually everybody would take care of it right on the spot, but it was always reported to me.

. . . .

Q. It's my understanding that you do not think it would be fair to say that you turned over the ship to the stevedores on this occasion. Is that fair?

A. I would never turn over the ship, no.

Q. You keep control of the ship during the loading all the time, correct?
Mr. Meyer: I'll object to that.

A. They are delegated with responsibility of loading. I oversee.

Q. I asked a horrible question, and I'm sorry. In December of 1994, with regard to the CAPE VINCENT, am I correct that you did not turn over the ship to the stevedores?

A. I did not turn over the ship then or ever.

Q. And you kept track—and I wrote down some stuff. You oversaw the loading of the CAPE VINCENT on that day, correct?

A. That's correct.

Q. And you were following the stevedores. The stevedores would drive the vehicles to where they were going to be placed, chain them down and you followed them around on that particular day, correct?

A. Yes.

Q. Okay. And any oil spills were your responsibility to clean up. Do you agree with that?
Mr. Myer: I'll object to that.

A. Final responsibility left with me, but there were others in the crew that it was their responsibility to clean up anything that they saw immediately, yes.

Q. Well, thank you. And I apologize. I asked a bad question. Let me ask the question that you just answered so we can have a clear transcript. Am I correct, sir, that you and other members of your crew are ultimately responsible for cleaning up any oil spills aboard the deck of the CAPE VINCENT?

A. Ultimately responsible, yes.

Q. And there were actually crew members that were on the deck specifically watching for safety hazards, correct?

A. That's correct.

Q. And if there was any oil spilled on the deck, hypothetically speaking, they should have seen it, correct?

A. Yes, that's correct.

Q. And if they did not clean it up immediately, because they are in charge of scanning over this area, then they would have also made a mistake, correct? Let me re-ask my question. That was a little confusing. Since you had people following the stevedores—that's what you've told me, right?

A. That's correct.

Q. They should see any oil that gets on the deck, right?

A. Well, yeah, that's correct, in part.

Q. Okay. So, if they did not see some oil that got on the deck, then somebody just made a mistake?

A. I don't know if I would agree with that. Stevedores have a certain amount of responsibility in that respect as well. They have safe practices that they follow.

Q. Well, the stevedores would have made a mistake as well as yourself, right?

A. Anybody that didn't clean up oil, it would have been a mistake. If they didn't see it, I can't say it would be a mistake, if no one had seen it.

The CAPE VINCENT's boatswain, John T. Herman, testified:

Q. What was your position aboard the MV CAPE VINCENT in December of 1994?

A. I was boatswain on there.

Q. Describe your duties as boatswain. What does that entail?

A. Well, I run a deck crew.

Q. All right.

A. I'm under the chief mate. I run a deck crew.

Q. All right. What responsibility do you have for the cleanliness of the cargo spaces aboard the ship?

A. We keep it up, you know. Everybody takes care of business.

Q. All right. Describe your routine for inspecting the cargo spaces and making sure they stayed clean.

A. Well, we did that everyday. We did it periodically through the day, also. We had stations where we had Speedy Dry. If they would have a leakage or anything of any sort, we went around with Speedy Dry and cleaned it up.

Q. Right. You were the boatswain on the CAPE VINCENT on December 29, 1994, when it undertook to load the Army vehicles in Beaumont, right?

A. Yes, sir.

Ken Pendergraft, a civilian employee of the United States Army, was in charge of terminal operations for the Army at the time of Rawlins' accident. On deposition, three months prior to trial, he gave the following testimony:

Q. How long have you been at the Port of Beaumont?

A. Since 1987.

Q. Are you in charge of the Port of Beaumont?

A. Currently, yes, as chief of operations, Army side.

Q. In December of '94, were you in charge of the same?

A. No, I wasn't.

Q. What was your position in December of '94?

A. Terminal operations.

Q. What is that?

A. The reception of cargo coming in and out of the port.

. . .

Q. Who made the decision, the Government or Fairway, as to which vehicles to load at that particular time?

A. The Government does.

Q. And who decides where to place the vehicles on the vessel?

A. The Government does.

Q. And who is responsible for the maintenance of those vehicles?

A. The deploying unit.

Q. That would be the Government, right?

A. That would be the Government.

Q. And who is responsible for assuring that the ship is in a safe condition prior to putting the vehicles on the ship?

A. Military Sealift Command.

Q. So, the only thing that Fairway does is take orders from the Government?

A. That's correct.

Q. You are 100 percent in charge of maintaining, loading and placing the vehicles on the deck, correct?

A. That's correct.

Q. Likewise, you are responsible for the safety on the deck, correct?

Mr. Myer: I'll object. There is a law about that.

Q. Well, to your knowledge, in 1994, being in your position, was it the Government's duty to maintain a safe deck, safe ship?

A. The Government and as far as-sure, MSC has to provide a safe working environment on the ship.

Q. And oil on the deck creates a hazard, right?

A. True.

Q. Oil, I guess anywhere, creates a hazard, right?

A. Uh, huh.

Q. Is that a "Yes"?

A. Yes.

Q. And especially on a ship, you don't want oil on the deck, right?

A. Correct.

Q. Why is that?

A. It creates an unsafe environment.

Q. And people working on the ship, because it's a ship, kind of confined quarters, aren't always able to look down. Sometimes they have to be watching where they are walking, vehicles are being loaded and those sort of things, right?

A. True.

Q. So, if there is grease on a ship, especially when you are loading vehicles, it creates even more of a hazard, right?

A. Sure it would.

. . .

Q. Sure. What I'm talking about specifically about the CAPE VINCENT, we know that didn't happen.

A. Right.

Q. We know there was no vehicle damaged in any way, shape or form by the contractor on this particular incident, right?

A. Right.

Q. I mean, from time to time—I know one time somebody ran one off the side up here, didn't they, had to bring a crane in? Were you here when that happened? That might not have been a Government ship, might have been something else. But I remember that. On this occasion, if a vehicle was leaking oil, then it would have been the Government's responsibility because we know that Fairway didn't ruin any stuff?

A. Right.

Q. And if there was oil left over from before, in other words, for some reason there was a big oil spot left on the vessel and it wasn't cleaned up or whatever, that would likewise be the Government's responsibility, right?

A. True.

Q. So, if there was oil on the deck on this occasion, it's the Government's responsibility?

A. True.

Pendergraft testified under oath diametrically opposed to the foregoing testimony at the bench trial of this case. He attempted first to say he had never previously made those statements, then admitted that was "exactly" what he had testified three months previously, but, "I would have to retract that." His deposition was not used merely for impeachment by the plaintiff and third party defendant, but was introduced by both on the question of liability.

After all parties rested, the court inquired whether it was possible for the court and the parties to go aboard the vessel which was then docked in the Port of Beaumont. All parties agreed, and after suitable arrangements were made, the court, the court reporter, representatives of the parties, and the attorneys went aboard the vessel on a cloudy day after an intermittent rain had ceased. The condition of the former weather deck (the ship had been modified) was in the same condition as it was in 1994, insofar as the deck was concerned. There was testimony that this was true, and no testimony to the contrary.

During the trial, various witnesses had described a "pebbly" paint which had been applied to the deck to provide traction for personnel. It was apparently paint containing abrasive material. However, upon going upon the deck, it was not entirely covered with abrasive paint, but only certain walkways contained abrasive paint. Those walkways were along an area of both of the sides of the ship approximately 3' to 5' wide, and crosswalks across the 650–700' deck which were wide enough for one person to walk safely, or if walking two abreast, barely wide enough for those two persons to walk, while occasionally bumping into each other. There were only four or possibly five of such crosswalks. The remainder of the deck has the familiar gray paint applied directly on steel plates. It was wet and slippery, even without any oil upon it.

Based upon the testimony of the witnesses, the court's assessment of their candor, or lack thereof (as in the case of some witnesses for the defendant), the court's own observation of the deck, its conditions on a somewhat similar day, the court makes the following findings of fact.

### FINDINGS OF FACT

1. The CAPE VINCENT and its deck were not safe on the date Rawlins was injured.

2. MARAD (the United States) had not relinquished control over the CAPE VINCENT while she was being loaded, nor did it completely turn the vessel over to Fairway, the stevedore, for loading.

3. The vessel and crew had a duty to furnish Rawlins a safe place to work.

4. They negligently failed to do so,

5. Which was a proximate cause of Rawlins' accident and injuries.

6. The wet deck, even without the introduction of oil, was unreasonably dangerous because of the availability of abrasive paint to cover the entire weather deck, and not merely the side edges of the deck and the four or five cross-walks.

7. The United States knew of the danger and had the means, money, and opportunity to minimize the slippery conditions of a wet, slippery, painted steel deck.

8. The crew knew, or in the exercise of ordinary care should have known of the oil and water on the deck,

9. In ample time to clean and remove it, or place "Speedy Dry" on the spot or spots of oil and water.

10. Rawlins was aware of the oil and water before he fell, and reported to his foreman, who in turn reported it to the crew.

11. Rawlins, in order to get out of the way of a moving 18–wheel truck, stepped backward in the oily, wet spot on the deck which he had previously seen,

12. And thus was partially at fault, proximately causing his injuries and damages.

13. However, his negligence was substantially less than that of the owner and crew of the CAPE VINCENT, because in moving backward out of the way of an oncoming Army vehicle, he had limited time and space in which to avoid being hit by the truck.

14. Rawlins' negligence was 20%, and the negligence of the United States, the owner of the vessel, and its crew contributed 80% to the incident made the basis of this suit.

15. Rawlins suffered damages as a proximate result of the vessel's negligence.

16. The damages sustained by Rawlins are:

| | |
|---|---:|
| Past Medical | $ 23,444.90 |
| Future Medical | 30,000.00 |
| Loss of Earnings and earning capacity to date of trial | 23,500.00 |
| Present value (Discounted) for loss of earning capacity in the future | 171,421.71 |
| Pain and Suffering in the past to date of trial | 45,000.00 |
| Pain and suffering in the future | 300,000.00 |
| | $593,366.61 |

17. Rawlins work-life expectancy is 28 years, and his life expectancy is 36 years.

18. On a functional basis, Rawlins is at least 25% permanently disabled from working in the open labor market in this area, including full duties as a correctional officer. In addition, it is more probable than not Rawlins will need a knee replacement in the future, according to the undisputed medical testimony, and the court so finds.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over Rawlins' claim against the United States pursuant to the waivers of sovereign immunity contained in the Public Vessels Act, 46 U.S.C. §§ 7811–790, which incorporates relevant portions of the Suits in Admiralty Act, 46 U.S.C. §§ 741–752.

2. Venue is proper as the vessel was located in, the injury occurred in, and the plaintiff resides in the Eastern District of Texas, Beaumont Division.

3. The circumstances of Rawlins' employment on December 29, 1994, identify him as an "employee" and a "person covered under" the Longshore and Harbor Workers Compensation Act, 33 U.S.C. §§ 901–950 (hereinafter the "LHWCA"). 33 U.S.C. § 903(a); 33 U.S.C. § 902(3); 33 U.S.C. § 905(b).

4. The crew members violated a duty by failing to exercise reasonable care to prevent injuries to workers in the areas that remained under the active control of the vessel. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981).

5. The court having found that the United States actively involved itself in the loading of the CAPE VINCENT concludes that the United States is subject to, and breached the second *Scindia* duty requiring a vessel owner to avoid negligently injuring a longshoreman in areas under the active control of the vessel. *Scindia*, 101 S.Ct. at 1623.

6. The court concludes that the crew members had actual or constructive knowledge of the hazardous conditions aboard the CAPE VINCENT.

7. The court finds that Rawlins was injured in an area of the CAPE VINCENT that was not under the exclusive control of Fairway Terminals, or the military, and concludes that the United States, as shipowner, had a duty to longshoreman Rawlins. That duty was to exercise reasonable care under the circumstances, and that duty was breached.

8. The breach of that duty constituted negligence, and the negligence of the United States as shipowner proximately caused Rawlins' injuries to the extent of 80%.

9. Because the crew members of the CAPE VINCENT, the United States, through its agents, had actual knowledge that Rawlins' employer, Fairway Terminal,

was failing to protect its employees from a hazardous condition, the court concludes that the United States was negligent in failing to intervene to eliminate the hazardous condition which existed aboard the CAPE VINCENT. *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), *Gay v. Barge,* 266 915 F.2d 1007, 1011 (5th Cir. 1990). The duty to intervene is applicable to the United States because the United States, through its agents and representatives, retained the element of active control of the weather deck and exercised a supervisory role over the work on the CAPE VINCENT. *Williams v. M/V Sonora,* 985 F.2d 808 814–15 (5th Cir.1993).

10. The court concludes that the crew members were negligent pursuant to *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

11. Rawlins is entitled to recover the sum of $474,693.29 past and future necessary medical expenses, for pain and suffering, mental anguish, loss of earning capacity, and physical impairment which he has sustained in the past, as well as post-judgment interest at the rate of 4% per cent per annum from the date of judgment until paid.

12. Fairway Terminal Corp. has a lien for monies paid to the plaintiff for medical treatment and for compensation. *Miller v. Rowan,* 815 F.2d 1021 (5th Cir.1987); *rehearing denied,* 820 F.2d 1223 (5th Cir. 1987). Fairway and its insurers are entitled to reimbursement if the full amount of monies paid to the plaintiff in medical and compensation, $23,444.92 in medical and $23,158.56 in compensation benefits. A total of $46,603.46. From Rawlins' award of damages, $46,603.46 is to be deducted and paid to the Intervenor, Signal Mutual Indemnity Association, Ltd., to satisfy its lien for the Longshore Harbor Workers Compensation Act compensation paid to Rawlins that the carrier incurred.

13. The plaintiff, Rawlins, will recover a total of $428,089.83 of and from the United States (MARAD). Rawlins is also entitled to recover costs of court.

■ 14. Fairway Terminal is not liable to the plaintiff as Fairway Terminal is the plaintiff's longshore employer and plaintiff may not recover against Fairway in accordance with the Longshore & Harbor Workers Compensation Act. 33 U.S.C. §§ 901–950. "The liability of an employer prescribed in Section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee...." 905(a)

15. Fairway Terminal was joined as a third-party defendant by the United States of America. In its third-party complaint, the United States of America alleges that a contract existed between Fairway and the Military Traffic Management Command, and that pursuant to such contract, Fairway is obligated to indemnity and defend the United States for any and all damages recovered by plaintiff against the United States *in its capacity as owner of the military vehicles* loaded onto the M/V CAPE VINCENT. For the following reasons, the court finds that no such indemnity obligation exists.

■ 16. Fairway Terminal is not liable to the United States as vessel owner under Section 905(b). Section 905(b) of the Act provides: "The employer shall not be liable to the vessel for ... damages, directly or indirectly, and any agreements or warranties to the contrary shall be void." The vessel owner, therefore, may not obtain indemnity even by contract from a stevedoring employer. Fairway Terminal is the stevedoring employer, and was not found to have been negligent, and, therefore, cannot be liable to the United States as vessel owner for plaintiff's injuries.

■ 17. Fairway Terminal is not liable to the United States as cargo owner, as the United States is both vessel owner and cargo owner. Section 905(b) specifically prohibits indemnity to the vessel owner, either directly or indirectly. The attempt by the United States to recover indemnity

as cargo owner is an attempt to obtain indirect indemnity for the vessel owner, and is prohibited. 33 U.S.C. § 905(B); *Lewis v. Keyes 303, Inc.* 834 F.Supp. 191 (S.D.Tex.1993) (a third party action for indemnity cannot be maintained against the longshore employer by a third party, when the vessel and third party are closely aligned.) In this case, the vessel owner and cargo owner are the same entity.

█ 18. Alternatively, Fairway Terminal has no responsibility to indemnify the United States as cargo owner because the indemnity clause in question fails to meet the clear and unequivocal standard for indemnity agreements in maritime contracts by not clearly spelling out that it would be Fairway's responsibility to indemnify the United States for the negligence of the latter, in any capacity.

█ The indemnity clause of a contract will be construed strongly against the drafter, the United States Government in this case. *Krzywicki v. Tidewater Equipment Co.*, 600 F.Supp. 629 (D.Md.1985), *aff'd*, 785 F.2d 305 (4th Cir.1986). Admiralty permits an indemnity clause that enables the indemnitee to be indemnified even from the consequences of his own negligence, but such intent must be specified in unequivocal language to be enforced. *Roberts v. Williams–McWilliams Co.*, 648 F.2d 255 (5th Cir.1981); *Theriot v. Bay Drilling Corp.*, 783 F.2d 527 (5th Cir. 1986). It will never be assumed that an agreement to indemnify includes an indemnity for the indemnitee's own negligence. *Jurisich v. United Gas Pipe Line Co.*, 349 F.Supp. 1227 (E.D.La.1972).

The court finds that the injuries alleged by plaintiff were not caused, in whole or in part, by the negligence or fault of Fairway Terminal. Accordingly, any purported indemnity obligation which would otherwise exist is inoperable as the stated precondition has not been established.

Under *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the vessel is liable if it "fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas . . . under the active control of the vessel." See the Findings of Fact, *supra*, concerning the Chief Mate's testimony that the vessel never relinquished this responsibility to the stevedore and that the ship's crew actually inspected the cargo spaces to ensure they were clean, during cargo operations.

The plaintiff did slip on oil which was on the weather deck of the vessel. The plaintiff did not slip on a piece of military equipment, nor is there any direct evidence that the oil was seen leaking from the military equipment prior to its loading on board the vessel or at the time the equipment was placed on the vessel. The oil was allegedly on the deck for thirty minutes prior to the plaintiff's accident. The vessel's failure to identify the hazard and to remedy the situation in a cargo space under the active control of the vessel, is a breach of the vessel's duty of due care owed to the longshoremen.

A judgment will be entered accordingly.