LAKE CONROE MEDICAL CENTER, LTD. a/k/a Lake Area Medical Center, L.P. a/k/a Lake Conroe Medical Center Management, Inc., Appellant,

v.

KMT BUILDING COMPANY and Douglas Joslyn, Appellees.

No. 09–07–00520–CV.

Court of Appeals of Texas, Beaumont.

Submitted on Feb. 12, 2009.

Decided June 11, 2009.

542

Nathan A. Steadman, Keith Woods, Meyer, Knight & Williams, Richard A. Sheehy, Sheehy, Serpe & Ware, Houston, for appellant.

Douglas R. Drucker, Kirby D. Hopkins, Brian C. Bevilacqua, Drucker, Rutledge & Smith, The Woodlands, for appellees.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

Appellant Lake Conroe Medical Center, Ltd. a/k/a Lake Area Medical Center, L.P. a/k/a Lake Conroe Medical Center Management, Inc. ("LCMC") sued appellees KMT Building Company ("KMT") and Douglas Joslyn ("Joslyn") for allegedly breaching a contract for construction of a medical building. KMT and Joslyn filed a counterclaim, in which they asserted that LCMC had breached the agreement and sought to recover damages for LCMC's alleged breach of contract, and also sought foreclosure on KMT's mechanic's lien. After a jury trial, the trial court signed a judgment that awarded KMT actual damages of $460,057, foreclosed on the mechanic's lien, and ordered that LCMC take nothing against KMT and Joslyn. LCMC then filed this appeal, in which it raises seven issues for our consideration. We reverse and remand.

## BACKGROUND

Joslyn and his wife Kathy owned KMT. LCMC entered into a contract with KMT for the construction by KMT of two 15,000 square foot "office buildings" in Montgomery County. Joslyn and his wife had previously owned the land where the project was to be built, but they sold the land to LCMC before construction began. Joslyn testified that he and his wife agreed to discount the price of the property by $100,000 in consideration for LCMC's promise to contract with KMT for the construction of two office buildings.

Under the terms of the construction contract, LCMC was to pay KMT $2,796,000 for the two buildings, and the contract price could "be increased or decreased only in accordance with written change orders indicating the changes to be made and the cost for such change." The contract price was to be paid in accordance with a standard draw schedule, which was attached to the contract. The contract provided that KMT "hereby contracts and agrees to build, construct and complete in a good and workmanlike manner, according to the plans and specifications agreed upon by the parties hereto and attached hereto as Exhibit "A", and to furnish and provide all labor and material to be used in the construction...." The specifications attached to the contract indicated, among other things, that KMT was to construct two 15,000–square–foot buildings, "12 ADA Restrooms," [1] and the work was to include "[a]rchitectural plans and engineering[.]" The specifications did not state what material KMT was to use to frame the building. The draw schedule attached to the contract mentioned exterior frame construction and interior wall construction, but did not specify what materials were to be used.

The contract further provided as follows: "all additions or extras shall be paid for by Owner on the basis of [the] prior agreement. All such orders, adjustments and the charge therefor shall be in writing. Claims by the Contractor for extra costs must be approved by Owner in writing before executing the work involved. Additions shall be charged at cost + 20%." In addition, the contract stated, "[i]n the event that the Owner wishes to upgrade any items on the Specification Outline the increase in the cost of the upgrade above the allowance shall be added to the contract sum and the amount of such difference shall be paid to Contractor, and the draw next following installation of the item shall be increase[d] accordingly." Furthermore, the contract provided as follows:

The Contractor shall re-execute any work that fails to conform to the requirements of the Contract, the plans, specifications and drawing [sic] that appear or become evident during the progress of the work, and shall remedy any defects due to faulty materials or workmanship which appear within a period of one (1) year f[ro]m the date of completion of the Contract, all at Contractor's expense.

The contract also contained a merger clause, which provided:

This Contract and the contract documents represent the full and final agreement as to work to be performed by Contractor, and no verbal agreements not specifically covered by the Contract and/or Contract documents shall be of any force and effect and anything that has been understood by Owner not clearly stated herein must be agreed to

---

1. "ADA" is an abbreviation for the Americans With Disabilities Act. BLACK'S LAW DICTIONARY 39 (8th ed. 2004).

mutually by the parties and reduced to writing.[2]

At trial, Dr. Dimitrious Mantzoros, the general partner of LCMC, testified that the first building had to be made of steel because one of the tenants in the building was a hospital, and the hospital intended to have an emergency-room-type facility and an imaging facility. Mantzoros testified that the contract does not specify whether the building was to be constructed of wood or steel, but that he and his partners met with Joslyn before executing the contract, and they only discussed steel buildings with Joslyn. Mantzoros explained that having the building framed with steel was important because it allowed for "tremendous flexibility in moving walls around." According to Mantzoros, one of the intended purposes of the building was to serve disabled and injured people, and the contract required that all improvements shall be suitable for the purposes intended.

Mantzoros explained that after the plans had been completed, Joslyn informed him that it would take four months to have steel delivered, but that Joslyn could begin construction immediately if he used wood instead. Mantzoros testified that he "had concerns because I didn't want the wood building[,]" but because tenants had already signed leases, "I was between a rock and a hard spot. I had to make a decision, so I made the decision to at least proceed with Building 1." Mantzoros explained that he agreed to "just do Building Number 1 out of wood because it's a medical office." Mantzoros admitted that the contract did not indicate whether the building was to be framed with wood or steel. Mantzoros testified that the first building has not been certified as compliant with the requirements of the ADA, and LCMC was "going to have to do all the repairs that are necessary in order to get certified." Joslyn attempted to repair some of the ADA issues.

Mantzoros testified that the only change order he signed with respect to the building pertained to issues related to the foundation and the number of bathrooms the building was to contain. According to Mantzoros, some other change orders were "directly between Mr. Joslyn and [a tenant]. They were negotiating on their own. I was not involved, or Lake Area Medical Center was not involved in those contracts or change orders." Mantzoros testified that LCMC ultimately terminated KMT due to KMT's alleged failure to provide architectural plans, the building's noncompliance with the requirements of the ADA, and problems with easements for the utilities, and the next day, LCMC hired another company to construct the shell of the second building for $875,000. According to Mantzoros, the total cost of repairing the ADA issues was $62,629.73, and LCMC paid approximately $265,000 above the contract price to complete the project.

Lisa Dominey, the property manager of LCMC, testified that Mantzoros contacted her about building a medical office building in the Montgomery area. Dominey also testified that medical buildings are generally made out of steel "because you need that flexibility to be able to do future renovations or expansions. You need the space to free-stand so that you can take any walls out as you need to in order to make expansions or changes to the space." Dominey also testified that the hospital never received architectural drawings from KMT for either building one or building two. In addition, Dominey explained that

---

**2.** We find no indication in the trial record that either party ever objected to the introduction of parol evidence regarding the contract.

ADA issues are "major, [and] it was a requirement that should have been correct to begin with unless there were renovations."

Dominey testified that when she did a walk through in building one, she found several ADA violations, and she informed Mantzoros of the problems. Dominey testified that the cost of the necessary ADA repairs was $62,629. According to Dominey, electrical and plumbing repairs were also needed, and there was a strong odor in the building due to the water heaters being turned on without first being filled. Dominey also explained that KMT or Joslyn had placed illegal easements on the property, and the municipal utility district gave LCMC ninety days "to get the property platted or they were going to disconnect the utilities that they were serving to Building Number 1." According to Dominey, the required platting cost approximately $10,000, and LCMC incurred expenses totaling $15,500 for platting and easement issues. Furthermore, Dominey testified that LCMC incurred attorney's fees of approximately $122,000.

Dr. Wayne Farley, Jr., one of the partners of LCMC as well as one of its tenants, testified that LCMC would not have hired KMT if KMT had initially stated that it would construct the building from wood instead of steel. Farley testified that Dominey informed him that there were several ADA violations in the building. According to Farley, KMT's price for constructing the second building increased by approximately $500,000 because the cost of steel had increased, Joslyn had incurred additional costs in running utilities to the first building, and there were extra construction costs associated with a stone bridge on the property. Farley testified that LCMC terminated KMT because

the inability for Mr. Joslyn to explain to us adequately why the cost of Building Number 2 was going to be substantially more money was very concerning, and . . . around the same time we discovered all of the ADA deficiencies within Building Number 1. I think a combination of those things led to us deciding it was better to proceed with another builder.

Bill Barnier, a general contractor design builder, testified that he built the second building for LCMC. Barnier testified that he has never seen a construction contract like the one between LCMC and KMT, and he described that contract as "very loose[.]" Barnier testified that KMT's failure to obtain permits for the Texas Accessibility Standards was a breach of the parties' contract. Barnier testified that the only repair he made in the first building involved the sidewalk. In addition, Barnier opined that it is reasonable to terminate a contractor who executes documents on behalf of the owner without authority to do so or fails to provide architectural plans if the contract requires such plans.

James Weaver, a licensed architect, explained that he is qualified to testify as an expert on contractual issues related to construction. Weaver testified that on a project the size of building one, he would have expected architectural plans to be provided. Weaver explained that KMT's failure to supply architectural plans was a breach of the contract, and a reasonable and prudent contractor would have used an architect for building number one. Weaver testified that KMT used a residential building designer. According to Weaver, the HVAC systems in building one did not meet "either of the specified mechanical codes[,]" and the HVAC systems were not constructed in a good workman-like manner. Weaver also testified that building one contained major electrical problems. According to Weaver, the presence of ADA

issues and Energy Code violations also indicated that the building was not constructed in a good workman-like manner. In addition,. Weaver explained that the parties' contract did not specify whether the building was to be constructed of wood or steel. Weaver opined that the contract was not substantially completed when LCMC terminated KMT.

Charles Jacobis, an attorney for a title insurance company, testified that Joslyn signed utilities easements, purportedly on behalf of LCMC, to the property on which LCMC was building the project, but Joslyn had no legal right to do so because he no longer owned the property. Jacobis testified that the municipal utility district refused to accept the utilities easement because the property was not properly platted. According to Jacobis, the problems with the easements and platting indicate that KMT did not perform its work in a good workman-like manner, and LCMC's termination of KMT was justified.

Joslyn testified that he did not use an architect for the LCMC project; instead, he used a building designer. According to Joslyn, the term "architectural drawing" "does not necessarily mean an architect." Joslyn also testified that when KMT entered into the contract with LCMC, he did not intend to provide a steel structure; rather, Joslyn always intended to supply wood. According to Joslyn, both parties agreed that building one would be framed with wood, which was available immediately. Joslyn opined that the fact that the contract contained the term "framing" instead of "erected" indicated that the parties intended for wood to be used. Joslyn explained that there were "[c]onstant design changes" during the project. Joslyn testified that he has had experience with platting property, and that KMT could have completed platting the property if LCMC had not terminated KMT. Joslyn

testified that KMT was still owed retainage of $72,000.

Joslyn testified that LCMC ultimately paid $2,400,000 for the second building. According to Joslyn, LCMC wanted to convert building two into an urgent care facility, which would have caused Joslyn to incur significant extra costs for fireproofing, sprinkler systems, med-gas entrances, and power doors, and would have raised KMT's contract price. Joslyn testified that LCMC never gave KMT the opportunity to build the second building, but instead terminated KMT. Joslyn calculated that if KMT had built the second building as set forth in the contract, KMT would have made a profit of $219,000 (twenty percent of half of the original contract price, plus extras). When asked what KMT's profit would have been if KMT had built the second building "as it stands now," Joslyn testified that his profit would have been $411,000. Joslyn estimated that $10,000 per month was a "[v]ery fair" figure to compensate him for the six months of delays that resulted from the design changes. Joslyn testified that KMT performed the work in a good workman-like manner, and did not materially fail to comply with the contract. Joslyn opined that all of the ADA issues could have been "very easily fixed." According to Joslyn, if LCMC had not terminated KMT, KMT's subcontractors would have repaired any deficiencies. Joslyn also testified that he discounted the price of the land by $100,000 because of his estimated profit from constructing both buildings.

Kathy Joslyn testified that she was involved with the pricing and estimating on the LCMC project. Kathy explained that KMT's subcontractors stand behind their work, and KMT has never had difficulty with remedying any problems. According to Kathy, the contract between KMT and LCMC did not refer to a hospital, imaging

center, or emergency room, and the specifications were consistent with a medical office building, not a hospital facility. Kathy testified that LCMC made "a tremendous amount of changes constantly[.]" She further explained that KMT declined the opportunity to build an $800,000 home because of the LCMC project. Kathy also testified that KMT's profit margin on jobs was typically twenty percent, and KMT would have made a profit of twenty percent on the LCMC project if LCMC had allowed KMT to complete the contract.

Kathy testified that the extras for building one totaled $48,000, and KMT was not paid for those extras. Kathy testified that she believed $10,000 per month for the six months of delays during the project was "very fair." According to Kathy, KMT was always willing to repair any problems with building one, and KMT never refused to build the second building.

## ISSUE ONE

 In its first issue, LCMC argues that the evidence was legally and factually insufficient to support the trial court's award of damages to KMT. Specifically, LCMC complains that the evidence was insufficient to support the damages KMT recovered for unpaid invoices, lost time, and unpaid retainage. Because the legal sufficiency argument raised in this issue, if sustained, would result in rendition in favor of LCMC, we address it first. *See* TEX.R.APP. P. 43.3; *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex. 1981). In reviewing the legal sufficiency of the evidence, the test is whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not."

*Id.* In addition, we must "consider [the] evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.* at 822. To successfully challenge a broad-form question on damages that contains multiple elements, an appellant must show that there was inadequate evidence to support the entire damages award considering all of the elements. *Price v. Short,* 931 S.W.2d 677, 688 (Tex. App.-Dallas 1996, no writ); *Greater Houston Transp. Co., Inc. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex.App.-Corpus Christi 1993, writ denied).

With respect to KMT's damages, the charge asked the jury the following question:

> What sum of money if now paid in cash would fairly and reasonably compensate KMT for its damages, if any, as follows:
>
> The total unpaid amount KMT would have been entitled to receive had it completed the entire contract less the reasonable costs to complete the contract and remedy any defects.
>
> Answer in dollars and cents, if any.

The jury answered "$460,057.00[.]" The question did not identify the particular elements of damages or ask the jury to enter separate amounts for each type of damages; rather, it simply referred to "[t]he total unpaid amount KMT would have been entitled to receive[.]" Likewise, the judgment did not reflect the particular elements of damages upon which the trial court based its award of $460,057.00.

In its amended counterclaim, KMT sought damages for breach of contract and pled as follows:

> KMT agreed to discount the property $100,000.00 on which the buildings were to be constructed in consideration for

LCMC's promise to allow KMT to construct both 15,000 square-foot office buildings.... KMT provided construction services to LCMC in accordance with the terms of the Contract. Despite demand for payment, LCMC has refused to pay, and payment is now past due.... LCMC's breach prevented KMT from completing the Project in accordance with the Contract; subsequently, LCMC hired another contractor ... to complete the Project.

The jury had before it evidence that the parties entered into a contract for the construction of two medical buildings for $2,796,000, that LCMC terminated KMT and hired another company to construct the second building, and that LCMC paid $2,400,000 to the other company to construct the second building. The jury heard evidence that LCMC entered into a contract with another builder to construct the shell and parking lot of building two for $875,000, that LCMC entered into at least two contracts with that builder for the build-out of building two (one contract was for $205,333, and another contract was for $260,338) and that LCMC ultimately paid a total of $2,400,000 for the construction and build-out of building two. The jury heard evidence that if KMT had built the second building as set forth in the contract, KMT's profit would have been $219,000, and that KMT would have made a profit of $411,000 if LCMC had permitted KMT to construct the structure as it was ultimately built by the other builder. The jury also heard testimony that KMT typically made a profit of 20% on its jobs. In addition, the jury heard evidence that KMT discounted the price of the land by $100,000 in consideration for LCMC's agreement to contract with KMT to construct both buildings. Viewing the evidence in the light most favorable to the verdict, we cannot conclude that a reasonable and fair-minded jury could not have awarded actual damages of $460,057 to KMT. *See City of Keller,* 168 S.W.3d at 822, 827; *see also Price,* 931 S.W.2d at 688. Accordingly, we overrule LCMC's legal sufficiency challenge in issue one. Because of our resolution of issues six and seven below, we need not consider LCMC's challenge to the factual sufficiency of the evidence.

## ISSUES SIX AND SEVEN

In its sixth issue, LCMC argues that the trial court erred by refusing to submit a question to the jury as to whether LCMC substantially complied with the contract. In its seventh issue, LCMC contends the trial court erred by refusing to submit a question to the jury regarding which party breached the contract first. We address these issues together.

■ The standard of review for alleged error in the jury charge is abuse of discretion. *Steak & Ale of Tex., Inc. v. Borneman,* 62 S.W.3d 898, 904 (Tex.App.-Fort Worth 2001, no pet.). "The court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence." TEX.R. CIV. P. 278; *see Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex.2002). Litigants are entitled to have controlling fact issues submitted to the jury. *Triplex Commc'ns, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995); *see also Bel–Ton Elec. Serv., Inc. v. Pickle,* 915 S.W.2d 480, 481 (Tex.1996). In determining whether the trial court should have included LCMC's requested questions in the jury charge, we must examine the record for evidence supporting LCMC's requested questions and ignore all evidence to the contrary. *See Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex. 1992). "A trial court may refuse to submit an issue only if no evidence exists to warrant its submission." *Id.*

■ As a counterclaimant, for damages for breach of contract, KMT had the burden to obtain a finding that LCMC breached the contract. *See Winchek v. Am. Express Travel Related Servs.*, 232 S.W.3d 197, 202 (Tex.App.-Houston [1st Dist.] 2007, no pet.); *Skaggs v. Guerra*, 704 S.W.2d 51, 55 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.). Question one of the jury charge asked the jury as follows: "Did KMT materially fail to comply with the contract prior to LCMC's termination of KMT?" "Answer "YES" or "NO"." The jury answered "NO." Because the jury did not answer affirmatively to the first question, the jury did not answer question two, which inquired about LCMC's damages. Question three was the question concerning KMT's damages, which is set forth in our discussion of issue one above, and to which the jury responded, "$460,057.00[.]" LCMC submitted questions and instructions concerning whether LCMC failed to comply with the contract and which party breached the contract first. LCMC also obtained a ruling in which the trial court refused to submit LCMC's requested questions. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992) (test for preservation of charge error is whether party timely and plainly made the trial court aware of its complaint and obtained a ruling). During the charge conference, the trial court indicated its agreement with KMT's counsel's assertion that if the jury answered "no" to question one, then LCMC's termination of KMT constituted a breach by LCMC as a matter of law.

We now examine the record for evidence supporting LCMC's proposed questions and ignore all contrary evidence. *See Elbaor*, 845 S.W.2d at 243. We turn first to LCMC's proposed question that inquired whether LCMC failed to comply with the construction agreement and instructed the jury that any such failure by LCMC would be excused if KMT made a false representation or concealed material facts upon which LCMC relied to its detriment. An expert witness testified that KMT's failure to supply architectural plans was a breach of the contract. Another expert witness testified that KMT's failure to obtain utilities easements in the proper manner indicated KMT did not perform in a good and workman-like manner. In addition, the record includes evidence that Joslyn signed utilities easements, purportedly on behalf of LCMC, but Joslyn had no legal right to do so because he no longer owned the property. Therefore, the trial court erred by refusing to include LCMC's requested question in the charge. *See Elbaor*, 845 S.W.2d at 243 (A trial court may refuse to submit an issue only if no evidence exists to warrant its submission.). The trial court's error probably caused the rendition of an improper judgment because it permitted KMT to recover damages in the absence of a finding that LCMC breached the agreement. *See* Tex. R.App. P. 44.1(a)(1); *Winchek*, 232 S.W.3d at 202; *Skaggs*, 704 S.W.2d at 55. We sustain issue six.

■ As previously discussed, LCMC also requested a question that inquired whether KMT or LCMC first "failed to comply with a material obligation of the construction agreement" and contained an instruction indicating that "[a] failure to comply with an agreement is excused by the other party's first breach of [a] material obligation of the same agreement." *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.") (cit-

ing *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 692 (Tex.1994)).

■ The record contained evidence that KMT failed to provide architectural plans, the building did not comply with the requirements of the ADA, and there were problems with the easements for the building's utilities. In addition, the record also includes evidence that although the contract required KMT to provide architectural plans, KMT never provided architectural plans and instead hired a building designer to draw the plans. An expert witness also testified that the ADA problems, the failure of the building's HVAC systems to meet the required mechanical codes, and the building's electrical problems indicated that the building was not constructed in a good workman-like manner. Therefore the trial court erred by refusing to include in the jury charge LCMC's proposed question that inquired which party breached the contract first, and its error probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a)(1); *Mustang Pipeline Co.,* 134 S.W.3d at 196; *Elbaor,* 845 S.W.2d at 243. We sustain issue seven. We need not address Lake Conroe's remaining issues, since they would not result in greater relief than a new trial. *See* Tex.R.App. P. 47.1. We reverse the trial court's judgment and remand the case for a new trial.

REVERSED AND REMANDED.