In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-13-00237-CV
_____

IRIKA SHIPPING S.A. AND PROSPERITY MANAGEMENT S.A.,
Appellants

V.

QUINTON HENDERSON, Appellee

On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-185,296

MEMORANDUM OPINION

This is an appeal of a jury verdict and judgment awarding a longshoreman damages for injuries he claims he sustained when he slipped and fell while working on the deck of a vessel. We reverse the trial court's judgment and remand for a new trial.

UNDERLYING FACTS

Quinton Henderson (Henderson), a longshoreman, alleges that he sustained injuries when he fell while he was working on the deck of the M/V Tina III[1] (the Vessel). Henderson filed suit against Irika Shipping S.A. (Irika), the manager of the Vessel, and Prosperity Management S.A. (Prosperity), the owner of the Vessel, pursuant to 33 U.S.C. § 905(b) for negligence. A jury found that the negligence of Irika, Prosperity, and Henderson proximately caused the occurrence in question, allocated a percentage of negligence to each party, and awarded Henderson $1,734,943.00 in damages. Irika and Prosperity filed this appeal challenging the Amended Final Judgment entered in favor of Henderson. Irika and Prosperity filed a joint brief on appeal and will be collectively referenced as "the Vessel Defendants" or "Appellants." Appellants raise three issues on appeal arguing that (1) the trial court erred in denying their motion for directed verdict, (2) the evidence is legally and factually insufficient to support the verdict, and (3) the trial court erred in omitting requested language in the charge and in the issues submitted to the jury.

---

[1]The Vessel was named the M/V Tina III at the time of the accident, and later renamed by subsequent owners.

The Vessel is a bulk carrier that transports cargo, including but not limited to "petcoke."[2] Henderson claims he slipped and fell "in a mixture of petcoke and water in an area that was freshly painted, slippery when dry and did not have non-skid paint." In his First Amended Petition, Henderson alleged that Prosperity and Irika owed him a duty of care, that they were negligent and breached their duty of care, and that he was injured as a result thereof. At the time of the alleged accident, the Vessel was docked at the Valero terminal in Port Arthur. Henderson's employer, Kinder Morgan, was acting as a stevedore at the time of his accident and Henderson was monitoring the loading of "petcoke" via a loading arm into the holds of the Vessel.[3]

Henderson testified that there were non-skid walkways on both sides of the Vessel, but not between the hatches. He stated that the deck was slippery, wet from rain, and shiny, as though it had recently been painted. Jordan May, Henderson's trainee, who was working with Henderson on the day of the accident, testified that the petcoke makes the deck slippery, especially during the rain. May testified that

[2]"Petcoke" is an abbreviation used for "petroleum coke," "a solid nonvolatile residue which is obtained as the final still product in the distillation of crude petroleum and whose purity makes it desirable . . . as a fuel[.]" WEBSTER'S THIRD NEW INT'L DICTIONARY 1691 (2002).

[3]According to Henderson, a surveyor monitored the loading, and the surveyor, along with the captain or officer, dictated the amount of petcoke loaded into each particular hold.

the deck was wet and appeared freshly painted, petcoke dust had fallen onto the deck, and the weather was rainy and cold. Henderson and May both testified that one of the Vessel's crew members had slipped on the deck before Henderson fell. Henderson testified that he knew the deck could become slippery if petcoke landed on the deck's surface and that the rain caused the deck to be even more slippery. Henderson did not advise anyone on the Vessel that the deck was slippery even when dry. Henderson explained to the jury that he was monitoring the petcoke load and approached the next hatch when he slipped and fell between the hatches. He believed the fall was caused by the wet deck and lack of a non-skid surface.

Captain Sergiy Balakirev, who served on the Vessel, testified by video deposition that there is non-skid paint on the deck in some areas of the Vessel, but not between the hatch coamings. Balakirev also testified that there was light rain on the day of Henderson's accident, that the crew knew that petcoke raises dust during loading, and that the petcoke dust will fall onto the deck. Cory Hargis, a marine surveyor, also testified that petcoke is dusty and typically falls onto the Vessel's deck during the loading process.

In its safety manual,[4] Irika states it has an obligation to take "reasonable practicable steps to safeguard the health and safety aboard ship of all employees and other persons who may be affected by [Irika's] acts or omissions[,]" including the duty to provide "the means for all places of work in the ship to be in a condition that is safe and without risk to health." The policy requires that "all places of work are kept clean and tidy[]" and that "[d]ecks and alleyways of the vessel are kept clean and free from slippery substances[.]" The vessel's master is required to "ensure that a safe means of access is provided and maintained to any place on the ship at which a person may be expected to be." Irika's policies further provide:

> The Regulations for Safe Movement on Board Ship place an obligation on the Master to ensure that a safe means of access is provided and maintained to any place on the ship at which a person may be expected to be. . . . Places on the ship at which a person may be, include accommodation areas as well as normal places of work. Persons in this context include dock workers and other visitors to the ship on business but excludes person who have no right to be on the ship.
>
> . . .
>
> All deck surfaces used for transit about the ship and all passageways, walkways and stairs shall be properly maintained and kept free from materials or substances liable to cause a person to slip or fall. . . .

---

[4]According to testimony at trial, Irika's safety manual was promulgated in accordance with the International Safety Management (ISM) Code.

Where an area is made slippery by snow, ice or water, sand or some other suitable material should be spread over the area. Spills of oil or grease etc[.] must be cleaned up as soon as practicable and the place guarded until clean.

. . .

Particular attention shall be given to ensure the safe movement about the ship of dock-workers and visitors who will be less familiar with possible hazards, especially on working docks.

. . .

Decks which need to be washed down frequently or are liable to become wet and slippery, shall be provided with effective means of draining water. . . .

Konstantinos Tsangaios, a former port captain, testified that Irika and Prosperity had entered into an agency agreement, which provided that Irika was the agent for Prosperity. Tsangaios and Balakirev both testified that the Vessel's crew was responsible for following Irika's policies. Balakirev affirmed that (1) the policies were established to prevent unsafe acts and personal injuries, including avoidable incidents that may cause personal injury; (2) safety is essential to Irika's operating objectives; (3) the policies are intended to protect both personnel and others doing business on the Vessel; (4) certain officers were responsible for keeping watch

over cargo operations; (5) the Vessel's bosun[5] is required to ensure that transit areas are safe and clean; and (6) the officer on duty must make rounds at least once per hour.

Henderson's expert witness, Captain Mitchell Stoller, a maritime consultant and former captain, testified that Irika failed to follow its own safety procedures. Stoller, who had served as captain on different Exxon vessels, explained that Exxon requires "the whole main weather deck with non-skid." Stoller testified that the Vessel's chief mate has overall responsibility for cargo operations and has a duty to intervene if loading is proceeding in an unsafe manner. He testified that the vessel's crew is charged with knowledge of the weather conditions and that a person has knowledge of the condition when it is raining and petcoke has fallen onto the deck. According to Stoller, petcoke mixed with water is oily and slippery and if a slippery substance is on the deck, Irika's policy required Irika to immediately clean the deck. He explained that the "transit area where the longshoremen transverse did not comply with [Irika's] manual."

The Vessel Defendants' witness, David Scruton, a marine surveyor and consultant, testified that petcoke is extremely dusty and the petcoke dust generally

---

[5]"Bosun" is a variation of "boatswain." WEBSTER'S THIRD NEW INT'L DICTIONARY 244, 258 (2002). He is a vessel crewmember that acts much like the foreman of the deck crew.

covers the entire vessel, but can build up in certain areas. Scruton confirmed that this is a normal and expected condition during petcoke loading. He testified that the deck would be slightly more slippery if water was mixed with the petcoke dust, but that this is an "acceptable condition[.]" Thus, he opined that appellants did not violate their own policy.

Another one of the Vessel Defendants' witnesses, John Petersen, tendered as an expert in marine coatings and safety, testified that when petcoke and water mix it creates a slippery condition and that this caused Henderson's fall. Petersen stated that the Intersheen 579 paint that was used by the Vessel Defendants to paint the deck of the Vessel is not slippery when dry. He testified that in his experience non-skid paint is generally not applied "athwartship, between the hatches[.]" However, if the Vessel owner wanted to place non-skid in the areas between the hatches it was the Vessel owner's "prerogative" to do so. On direct examination Petersen testified that applying sand is the standard and best way to address an area that has become slippery, but that rubber mats could also be used. Petersen testified that the deck is more slippery when wet and that during cargo operations, it is normal, anticipated, and expected that cargo residue falls onto the vessel deck and has to be cleaned. He confirmed that, per Irika's manual, Irika employees are responsible for spreading sand or some other material on areas that have become slippery because

8

of snow, ice, or water. Petersen also confirmed that a vessel's crew is aware of the weather forecast and knows there will be some spillage of cargo onto the deck.

The parties stipulated that on the day Henderson allegedly slipped and fell that: (1) "the areas of the main deck of the vessel with nonskid paint were the walkways running fore and aft and the areas forward and aft around the mooring winches and the anchor []windlass as well as around some bollards or capstans on the main deck[;]" and (2) "there was no nonskid paint on the surface of the main deck in the areas between the hatches." The matter was submitted to the jury on a negligence claim. The jury returned a verdict finding that the negligence of (1) Prosperity, Irika, and Henderson proximately caused the fall; and that (2) Prosperity was thirty percent negligent, Irika was forty percent negligent, and Henderson was thirty percent negligent. Irika and Prosperity filed a joint motion for judgment notwithstanding the verdict which was overruled. The trial court entered a Judgment and then an Amended Final Judgment in favor of Henderson. The trial court denied the motion for new trial. Prosperity and Irika timely filed a joint notice of appeal.

### ISSUES ON APPEAL

The Vessel Defendants raise three issues on appeal. They argue: (1) the trial court erred as a matter of law in failing to dismiss the claim because the entire

9

action is a "proscribed claim for unseaworthiness"; (2) there is insufficient evidence to support the jury's verdict; and (3) the trial court erred in submitting the charge to the jury.

MOTION FOR DIRECTED VERDICT AND LEGAL SUFFICIENCY CHALLENGE

Appellants contend that Henderson's negligence claim is an unrecoverable claim for unseaworthiness and that, consequently, the trial court erred by denying their motion for directed verdict. A trial court may grant a directed verdict "if no evidence of probative force raises a fact issue on the material questions in the suit." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Exxon Mobil Corp. v. Kinder Morgan Operating L.P.*, 192 S.W.3d 120, 126 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Prior to the 1972 amendment to the Longshore and Harbor Workers' Compensation Act, the unseaworthiness doctrine was available to longshoremen who were injured while loading a ship or vessel. *See, e.g., Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946). An unseaworthiness claim "could be proven merely by showing that a dangerous condition existed on the ship; no showing of fault on the part of the owner was necessary, and even if the unsafe condition had been created by the stevedore, the shipowner was liable for the longshoreman's injuries." *Lieggi v. Mar. Co. of Phil.*, 667 F.2d 324, 326 (2nd Cir. 1981). Section

10

905(b) eliminated a longshoreman's ability to impose strict liability on the vessel owner:

> In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party in accordance with the provisions of section 33 of this Act [33 USCS § 933], and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . *The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. . . .*

33 U.S.C. § 905(b) (emphasis added); *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 164-65 (1981). By eliminating the warranty of seaworthiness, "[c]ongress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." *Scindia Steam Navigation Co.*, 451 U.S. at 168.

To establish a claim under section 905(b), the plaintiff must show that the vessel owner violated what the courts have described as one of three duties: the turnover duty, the active control duty, and the duty to intervene. *Id.* at 161, 167-68; *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036 (5th Cir. 1983). The "turnover duty," relates to the condition of the ship upon the commencement of stevedoring

11

operations, and the vessel owner is charged with the duty to warn longshore workers of latent hazards that are known to the shipowner or should be known to it in the exercise of reasonable care. *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994). "Latent hazards" are defined in this context as hazards that are not known to the longshoreman and that would be neither obvious to nor anticipated by a skilled worker in the competent performance of his work. *Id*. at 99-100. The "active control duty" applies once stevedoring operations have begun, and it provides that a vessel owner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel[.]" *Scindia Steam Navigation Co.*, 451 U.S. at 167. Finally, the "duty to intervene" arises after the stevedore's cargo operations have begun and it concerns the vessel owner's duty or obligation to intervene when the vessel owner has actual knowledge of a danger to a longshoreman, and knowledge that the longshoreman's employer is not acting reasonably to protect its employees with respect to cargo operations in areas under the principal control of the independent stevedore. *Howlett*, 512 U.S. at 100-01. "[T]he shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself." *Scindia Steam Navigation Co.,* 451 U.S. at 172. With respect to the duty to intervene, "absent contract provision, positive law, or custom

12

to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.*

Appellants contend that Henderson's negligence claim is based solely on a design defect, *i.e.*, the lack of non-skid paint, which appellants argue is nothing more than an unseaworthiness claim. Henderson argues that the Vessel's deck was slippery and unsafe because it had been freshly painted, it was slippery even when dry, it had petcoke and rain water on the deck's surface, and it lacked non-skid paint in the area where he fell. At trial, Henderson introduced copies of Irika's manual and guidelines, as well as testimony from an expert witness that Irika's own documents required Irika to "prevent unsafe acts, personal injury, damage to property and environment, to protect all personnel, not just ship employees . . . including dock workers, from avoidable injury and hardship[,]" and that Irika failed to follow its own policy. Henderson argued that Irika and Prosperity were responsible for transit areas. Henderson also emphasized other statements in the Irika manual where it stated "[a]ll deck surfaces used for transit about the ship and [that] all pathways, walkways and stairs shall be maintained and kept free from materials or substances liable to cause a person to slip or fall" and "[w]here an area

13

is made slippery by snow, ice or water, sand or some other suitable material should be spread over the area."

Section 905(b)'s negation of a vessel's liability for unseaworthiness was not intended "'to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition' as long as the vessel was not 'chargeable with the negligence of the stevedore or employees of the stevedore.'" *Scindia Steam Navigation Co.*, 451 U.S. at 166 n.13 (quoting S. Rep. No. 92-1125, p. 10, 11 (1972)). In this case, Henderson's negligence claim is not solely based on the lack of non-skid paint between the hatches or a "design defect," but it is also based on the slippery deck created by the accumulation of water and petcoke dust, and the presence of fresh paint on the deck's surface. There was sufficient evidence to establish that Henderson was asserting a negligence claim that fits within one or more of the *Scindia* duties. *See Helaire*, 709 F.2d at 1038-39; *see also Lieggi*, 667 F.2d at 328; *Rawlins v. United States*, 56 F. Supp. 2d 741, 743, 749-50 (E.D. Tex. 1999) (holding the United States liable for negligence under section 905(b) when a longshoreman slipped and fell on a vessel's deck on which oil or hydraulic fluid and rain water were present). Accordingly, the trial court could reasonably conclude that Henderson's negligence claim was not an attempt to invoke the

14

unseaworthiness remedy and therefore the trial court properly denied the motion for directed verdict. We overrule issue one.

In their second issue, appellants makes a similar challenge to the legal sufficiency of the evidence, arguing that the evidence is legally insufficient to support the jury's verdict. Legal sufficiency challenges are characterized as either "no evidence" challenges or "matter of law" challenges, depending on which party has the burden of proof. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied). Because Henderson did not have the burden of proof on the issues, the Vessel Defendants must demonstrate in their appeal that no evidence supports the jury's findings to prevail on the legal sufficiency arguments that it advances in issue two. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Christus St. Mary Hosp. v. O'Banion*, 227 S.W.3d 868, 873 (Tex. App.—Beaumont 2007, pet. denied).

We use the same objective standard to evaluate whether the evidence presented to a jury is legally sufficient to support a verdict, as we did to examine the denial of the directed verdict. *Am. Cas. Co. v. Hill*, 194 S.W.3d 162, 164 (Tex. App.—Dallas 2006, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)). If the evidence being reviewed allowed reasonable and fair-minded people to reach the verdict being reviewed, the appeals court is required to uphold

15

the judgment. *City of Keller*, 168 S.W.3d at 827. In a legal sufficiency review, appellate courts are to "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.*; *see also Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006). A legal sufficiency challenge will be sustained "when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla." *Suberu*, 216 S.W.3d at 793. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

As noted above, there is evidence in the record that the Vessel Defendants were negligent and breached one or more of the *Scindia* duties. There was some evidence in the record from which a reasonable jury could have concluded that Irika and Prosperity breached either the turnover duty, the active control duty, or the duty to intervene. There was testimony that when the Vessel docked in Port Arthur her deck appeared shiny, freshly painted and that it was slippery when dry. There was testimony from Stoller that if a slippery substance is on the deck, Irika's policy required Irika to immediately clean the deck, and that the Vessel Defendants failed to comply with the Irika manual. Furthermore, Henderson and May testified that they saw a crew member of the Vessel slip on the deck prior to Henderson's

16

fall. And there was some evidence that the Vessel Defendants knew about the risks to others from slippery and hazardous conditions, and that their own manual imposed upon them the duty to spread sand or use mats in certain areas. Although the defendants disputed the evidence and had controverting testimony from other witnesses, we conclude that the evidence is legally sufficient to support a jury finding that appellants were negligent for either failing to turnover a vessel on which longshoremen could work in reasonable safety, for breaching the active control duty pertaining to the areas of the deck still under the control of the Vessel Defendants, or for failing to intervene. Notably, there was also some evidence that the Vessel Defendants failed to spread sand or use mats in areas where the longshoreman would be working, where there was a slippery condition, fresh non-skid paint, water, and petcoke. Furthermore, the jury's apportionment of fault between the parties was not legally insufficient, because there was some evidence in the record that would support a finding allocating the percentages of fault that the jury assigned to Irika, Prosperity, and Henderson. Accordingly, we also overrule the appellants' legal sufficiency challenge as outlined in issue two.

JURY CHARGE

Appellants argue that the trial court submitted an improper charge to the jury. The trial court shall submit instructions and definitions as shall be proper to

17

enable the jury to reach a verdict and which are raised by the written pleadings and the evidence. Tex. R. Civ. P. 277, 278. We review alleged jury charge error under an abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g); *Lake Conroe Med. Ctr., Ltd. v. KMT Bldg. Co.*, 290 S.W.3d 541, 548 (Tex. App.—Beaumont 2009, no pet.). We may not reverse for charge error unless the error "probably caused the rendition of an improper judgment[.]" Tex. R. App. P. 44.1(a)(1); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579-80 (Tex. 2006). To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Pinnacle Anesthesia Consultants, P.A. v. Fisher*, 309 S.W.3d 93, 109 (Tex. App.—Dallas 2009, pet. denied). Submitting the controlling issues to the jury in a logical, simple, clear, fair, correct, and complete manner is the goal of the jury charge. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). A "controlling issue" is an issue that requires a factual determination to render judgment in the case. *Smooth Solutions L.P. v. Light Age, Inc.*, No. 04-08-00093-CV, 2009 Tex. App. LEXIS 4695, at *8 (Tex. App.—San Antonio June 24, 2009, no pet.) (mem. op.). The trial judge must submit to the jury the controlling questions, instructions, and definitions raised by the pleadings and supported by the evidence. *See Triplex Commc'ns v. Riley*, 900

18

S.W.2d 716, 718 (Tex. 1995); *see also* Tex. R. Civ. P. 278. The trial court has broad discretion to fashion the jury charge, so long as it is legally correct. *Hyundai Motor*, 995 S.W.2d at 664.

A trial court is afforded greater discretion in submitting a jury instruction than a jury question; however, that discretion is not absolute. *Robin v. Entergy Gulf States, Inc.*, 91 S.W.3d 883, 886 (Tex. App.—Beaumont 2002, pet. denied). Texas Rule of Civil Procedure 277 requires the trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. We must examine the jury charge in its entirety, not merely a small portion taken out of context. *See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986). The issue of whether terms are properly defined or the instruction properly states the law is a question of law reviewed *de novo* on appeal. *Robin*, 91 S.W.3d at 886; *see also Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 225 (Tex. 2010). But, we may not reverse a judgment because of the "failure to submit other and various phases or different shades of the same question." Tex. R. Civ. P. 278.

"When an instruction, question, or definition is requested and the provisions of the law have been complied with and the trial judge refuses the same, the judge shall endorse thereon 'Refused,' and sign the same officially." Tex. R. Civ. P. 276.

19

Preservation generally depends on whether the complaining party timely and plainly made the trial court aware of the complaint and obtained a ruling. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007). Absent an endorsement on the proposed jury charge, the record must demonstrate that the trial court otherwise ruled on the request, either expressly or implicitly, for potential error to be preserved. *Jones v. Cortes*, No. 02-10-00304-CV, 2011 Tex. App. LEXIS 7385, at *9 (Tex. App.—Fort Worth Sept. 8, 2011, no pet.) (mem. op.).

To preserve error regarding the charge, the party must specifically object in sufficient detail to notify the trial court of the error and thus afford the court the opportunity to correct the error. The party should also explain the grounds of the objection. *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003); *Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex. 1987). Any complaint as to a question or an instruction is waived unless it is specifically included in the objection. Tex. R. Civ. P. 274. Additionally, the complaints made on appeal must comport with the objections and arguments made at trial. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). If the appellate court concludes that the trial court instructed the jury incorrectly on the controlling law, it will require the court of appeals to remand the case for a new trial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 158 (Tex. 1994).

Irika and Prosperity contend on appeal that they submitted a proposed jury charge that would have properly instructed the jury on the law of negligence pursuant to section 905(b), including instructions that appellants do not owe a duty to provide a seaworthy vessel, must have warned of a hazard on the vessel or a hazard with respect to the vessel's equipment only under certain circumstances, owe a different standard of care after stevedoring operations begin, and only owe a duty to intervene under certain circumstances. Appellants' proposed charge was not marked "refused" and the record does not demonstrate that the trial court otherwise ruled on the proposed charge.[6] Accordingly, our review is limited to whether or not the objections voiced by appellants were sufficient to preserve the alleged error and whether or not the trial court instructed the jury correctly on the controlling law. *See* Tex. R. App. P. 33.1(a).

The trial court instructed the jury as follows:

> **"NEGLIGENCE"** with respect to Prosperity Management, S.A. and Irika Shipping, S.A. means the failure to exercise reasonable care under the circumstances. A vessel owner and operator such as defendants must exercise reasonable care before the plaintiff's employer, here Kinder-Morgan, begins its operations on the vessel. This means Prosperity Management, S.A. and Irika Shipping, S.A. must use reasonable care to have the vessel and its equipment in such condition that an expert and experienced ship loading company would

---

[6]Appellants contend that their proposed charge was discussed during an informal charge conference, but there is no transcript or other document supporting such contention in the appellate record currently before us.

be able, by the exercise of reasonable care, to carry on its work on the vessel with reasonable safety to persons and property. Once Kinder-Morgan began operations on the M/V TINA III, if either Prosperity Management, S.A. or Irika Shipping, S.A. actively involved itself in those operations, it must exercise reasonable care in doing so. If, after Kinder-Morgan began operations on the M/V TINA III, either Prosperity Management, S.A. or Irika Shipping, S.A. maintained control over equipment or over an area of the vessel on which the plaintiff could reasonably have been expected to go in the performance of his duties, the defendant must use reasonable care to avoid exposing the plaintiff to harm from the hazards the plaintiff could reasonably have been expected to encounter from such equipment or in such area. Finally, if after Kinder-Morgan began its operations on the vessel, either Prosperity Management, S.A. or Irika Shipping, S.A. learned that an apparently dangerous condition existed or had developed in the course of those operations, the defendant must use reasonable care to intervene to protect the plaintiff against injury from that condition only if the plaintiff's employer's judgment in continuing to work in th[e] face of such a condition was so obviously improvident that the defendant should have known that the condition created an unreasonable risk of harm to the plaintiff.

In determining whether the defendant justifiably relied upon the decision of the plaintiff's employer to continue the work despite the condition, you should consider the expertise of the plaintiff's employer, the expertise of the defendant, and any other factors which would tend to establish whether the defendant was negligent in failing to intervene into the operations of the plaintiff's employer.

The trial court included a definition of "negligence" with respect to Henderson as follows:

**"NEGLIGENCE"** with respect to Quinton Henderson means failure to use reasonable care; that is, failure to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

22

"**REASONABLE CARE**" means that degree of care that would be used by a person or company of ordinary prudence under the same or similar circumstances.

Appellants objected to the charge during the charge conference as follows:

DEFENSE ATTORNEY: Defendants would object to the fact that the fifth circuit pattern charge was not filed [sic] in terms of the duty to intervene and specifically the language which was deleted in the context of the duty to intervene is: In determining whether the Plaintiff's employer's judgment is so obviously improvident that the Defendant should have intervened, you may consider that the Plaintiff's employer has a primary duty to provide a safe place to work for the Plaintiff and its other employees and that the Defendant ordinarily must justifiably rely upon the Plaintiff's employer to provide it[s] employees with a reasonably safe place to work.

To the extent that was not included in the charge, Defendants object.

. . .

Judge, one other thing. On the blanks we had a discussion about definition of "vessel interests." Are we going with all three parties at this point?

THE COURT: That's correct. I figured you need to address that.

DEFENSE ATTORNEY: We need to object to that as well. The 905-B definition in Section 21 defines vessel as being these various entities including owner/operator, charter. And it would be Defendants' position that, therefore, there should be a single blank for the defendant vessel interest and not two blanks.

A. Definition of Negligence, Seaworthiness, Duty to Warn.

On appeal, the appellants' first argument regarding alleged jury charge error is that the trial court erred in defining "Negligence" because for "purposes of comparative fault under § 905(b) cases, the conduct of a longshoreman is not measured against that of an ordinary person,' but is instead 'adjudged from the standpoint of a reasonable longshore worker under the circumstances.'" By instructing the jury to measure the conduct of Henderson against that of a person of ordinary prudence rather than that of a reasonable longshore worker, according to appellants, the charge fails to instruct the jury correctly and lowers the standard of care by which Henderson's conduct should be measured. Second, appellants argue that the charge omits the recognition that appellants do "not owe plaintiff the duty to provide a seaworthy vessel" and that it fails to include language that a vessel is only liable if it is "guilty of negligence that was the legal cause of the plaintiff's injury." Third, appellants argue that the trial court erred in failing to submit "any discussion of the vessel's corollary duty to warn of latent hazards under the turnover duty, which contains the open and obvious defense." However, appellants failed to make any of these objections to the charge and never brought the issues to the trial court's attention. Accordingly, we conclude that the Vessel Defendants did

not preserve these complaints for review on appeal, and we overrule each of these points. *See* Tex. R. App. P. 33.1(a).

B. Submission of Vessel Defendants in Question No. 2.

Appellants also complain on appeal about the trial court's submission of Question No. 2, arguing that the question was defective because "Question 2 erroneously asked the jury to separately quantify the fault of the vessel owner and the vessel operator." Question 2 was conditioned upon the findings in Question 1, and therefore should be read in conjunction with Question 1 of the jury charge. The respective questions and findings of the jury were as follows:

## QUESTION NO. 1

Did the negligence, if any, of those named below proximately cause the occurrence in question?

**ANSWER-"Yes" or "No" for each of the following:**

a. **PROSPERITY MANAGEMENT, S.A.**          **YES**

b. **IRIKA SHIPPING, S.A.**          **YES**

c. **QUINTON HENDERSON**          **YES**

## QUESTION NO. 2

What percentage of the negligence that caused the occurrence do you find to be attributable to each of those found by you, in answer to Question No. 1, to have been negligent?

a.  **PROSPERITY MANAGEMENT, S.A.**          **30%**

|   |   |   |
|---|---|---|
| b. | **IRIKA SHIPPING, S.A.** | **40%** |
| c. | **QUINTON HENDERSON** | **30%** |
|   | **TOTAL** | **100%** |

The Vessel Defendants objected on the record at trial as follows:

> DEFENSE ATTORNEY: Judge, one other thing. On the blanks we had a discussion about definition of "vessel interests." Are we going with all three parties at this point?

> THE COURT: That's correct. I figured you need to address that.

> DEFENSE ATTORNEY: The 905-B definition in Section 21 defines vessel as being these various entities including owner/operator, charter. And it would be Defendants' position that, therefore, there should be a single blank for the defendant vessel interest and not two blanks.

> THE COURT: Well, considering the concern over whether there would be joint and several liability and the viability potential -- or the potential for viability, or lack thereof, of either of the parties inability at this late hour for it to be resolved in terms of an agreement, the Court will overrule that objection and submit all three.

The Vessel Defendants failed to specify to the trial court whether their objection was to question one, question two, or both questions. And, the record does not demonstrate that any further argument was made to the trial court on this point. On appeal, the Vessel Defendants specifically complain only about question two and not question one. Accordingly, the Vessel Defendants did not preserve their objection on appeal to question two. *See* Tex. R. App. P. 33.1(a).

26

C. Omission of Language Related to the Duty to Intervene.

The Vessel Defendants' final argument regarding charge error pertains to omitted language in the instruction. More specifically, the Vessel Defendants expressly made the following objection:

> DEFENSE ATTORNEY: Defendants would object to the fact that the fifth circuit pattern charge was not filed in terms of the duty to intervene and specifically the language which was deleted in the context of the duty to intervene is: In determining whether the Plaintiff's employer's judgment is so obviously improvident that the Defendant should have intervened, you may consider that the Plaintiff's employer has a primary duty to provide a safe place to work for the Plaintiff and its other employees and that the Defendant ordinarily must justifiably rely upon the Plaintiff's employer to provide it[s] employees with a reasonably safe place to work.

> To the extent that was not included in the charge, Defendants object.

The language that was omitted pertains to the duty to intervene. Regarding the duty to intervene, the Fifth Circuit's pattern jury instruction includes the following:

> The standard of care [which] a vessel operator owes to [the plaintiff] after [the plaintiff's] employer began its operations on the vessel is different than the standard of care governing the vessel operator's actions before the employer began its vessel operations.

> If, after [the plaintiff's] employer [] began its operations on the vessel, [the defendant] learned that an apparently dangerous condition existed (including a condition which existed before [the plaintiff's] employer began its operations) or has developed in the course of those

27

operations, [the defendant] vessel owner must use reasonable care to intervene to protect [the plaintiff] against injury from that condition only if [the plaintiff's] employer's judgment in continuing to work in the face of such a condition was so obviously improvident that [the defendant] should have known that the condition created an unreasonable risk of harm to [the plaintiff]. *In determining whether [the plaintiff's] employer's judgment is "so obviously improvident" that [the defendant] should have intervened, you may consider that [the plaintiff's] employer has the primary duty to provide a safe place to work for [the plaintiff] and its other employees, and that [the defendant] ordinarily must justifiably rely upon [the plaintiff's] employer to provide his employees with a reasonably safe place to work.* In determining whether [the defendant] justifiably relied upon the decision of [the plaintiff's] employer to continue the work despite the condition, you should consider the expertise of [the plaintiff's] employer, the expertise of [the defendant], and any other factors that would tend to establish whether [the defendant] was negligent in failing to intervene into the operations of [the plaintiff's] employer.

Fifth Circuit Pattern Jury Instruction No. 4.11, *available at* http://www.lb5.uscourts.gov/juryinstructions/fifth/2014civil.pdf (emphasis added).

The trial court's charge in this case omitted the italicized language. The Vessel Defendants expressly requested that the omitted language be included. And, the Vessel Defendants read into the record the language that was omitted.

Although the Vessel Defendants did not explain or state specifically why the omitted language was necessary, under the facts and circumstances of this case, the specific grounds were apparent from the context and content of the omitted language. Accordingly, we conclude that the Vessel Defendants adequately preserved their objection to the omission of the requested language. *See* Tex. R.

App. P. 33.1(a); *see also State Dep't of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) ("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.); *Anderson v. Higdon*, 695 S.W.2d 320, 325 (Tex. App.—Waco 1985, writ ref'd n.r.e.) (objection can be considered to be sufficiently detailed if the stated grounds are sufficient to support the conclusion that the trial court was fully cognizant of the ground of complaint and deliberately choose to overrule it).

Because the vessel owner has a reasonable expectation that the stevedore will provide a safe place to work for the longshoremen in the stevedore's employ, and also inspect the work areas, courts have described the "duty to intervene" as a "narrow duty that 'requires something more than mere shipowner knowledge of a dangerous condition.'" *Aguilar v. Bollinger Shipyards, Inc.*, 833 F. Supp. 2d 582, 592 (E.D. La. 2011) (quoting *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996)). "[I]t is the *stevedore*, not the shipowner, who assumes the responsibility for the safety of its employees[,]" and the vessel owner is entitled to rely on the stevedore's expertise to remedy a dangerous condition. *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 215-16 (5th Cir. 1984).

Nevertheless, the vessel owner may still owe a duty to intervene. The *Scindia* "duty to intervene" imposes liability upon a vessel owner if the owner has "actual knowledge both of a hazardous condition *and* that the stevedore, in the exercise of 'obviously improvident' judgment, intends to continue work in spite of that condition." *Gay v. Barge* 266, 915 F.2d 1007, 1012 (5th Cir. 1990) (emphasis in original); *see Helaire*, 709 F.2d at 1036 ("[E]ven though the owner is generally relieved of responsibility for accidents which occur once the unloading process has begun, 'if [the stevedore's] judgment . . . was so obviously improvident that [the owner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the [defect] presented an unreasonable risk of harm to the longshoremen, . . . in such circumstances [the owner] had a duty to intervene' and eliminate or neutralize the hazard.") (quoting *Scindia Steam Navigation Co.*, 451 U.S. at 175-76). This duty has been described as "narrow and requires 'something more' than mere shipowner knowledge of a dangerous condition." *Singleton*, 79 F.3d at 28 (quoting *Futo*, 742 F.2d at 215). "[I]n order for the expert stevedore's judgment to appear 'obviously improvident,' that expert stevedore must use an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm -- even when the stevedore's expertise is taken into account." *Greenwood v. Societe Francaise De*, 111 F.3d

30

1239, 1249 (5th Cir. 1997) (citations omitted); *see also Clay v. Daiichi Shipping*, 74 F. Supp. 2d 665, 674 (E.D. La. 1999). Nevertheless, "[t]he shipowner, within limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoreman to inspect or supervise the cargo operations." *Scindia Steam Navigation Co.*, 451 U.S. at 172 (emphasis in original); *Greenwood*, 111 F.3d at 1249.

Notably, the Supreme Court has stated that with respect to the vessel owner's duty to intervene that "absent contract provision, positive law, or custom to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. *See Scindia Steam Navigation Co.*, 451 U.S. at 172. Henderson argued to the jury that Irika's own safety manual contained language that established what Prosperity and Irika should have done and that the Vessel Defendants failed to comply with Irika's own manual.[7]

---

[7]According to the record on appeal, Henderson also requested a proposed instruction for additional language regarding the negligence of the Vessel Defendants. More specifically, Henderson requested and the trial court refused to submit the "ISM Code" instruction which plaintiff states in the record he tendered to be included as part of the negligence definition for the two defendants. However, a copy of the tendered instruction is not included in the clerk's record. And, it is unclear from the reporter's record whether Henderson's "ISM Code" instruction relates specifically to the duty to intervene, and Henderson did not cross-appeal on this point.

Henderson and the Vessel Defendants presented evidence to the jury pertaining to Irika's safety manual, the International Safety Management standards, as well as custom and practice in the industry with respect to non-skid surfaces and paint, and the safety programs and applicable rules and regulations governing vessel owners. Additionally, the Vessel Defendants presented evidence to the jury that it was generally the obligation of the stevedore (the employer of Henderson) to provide Henderson with a safe place to work, but the vessel owner retained a duty to intervene under certain circumstances.

The charge as submitted properly instructed the jury that:

In determining whether the defendant justifiably relied upon the decision of the plaintiff's employer to continue the work despite the condition, you should consider the expertise of the plaintiff's employer, the expertise of the defendant, and any other factors which would tend to establish whether the defendant was negligent in failing to intervene into the operations of the plaintiff's employer.

However, appellants argue that by omitting the requested instruction the charge erroneously omits language regarding the stevedore's primary duty to provide a safe workplace for its employees. We agree. An instruction is proper if it might aid the jury in answering the questions presented to them, or if there is any support in the evidence for the instruction. *Louisiana-Pacific Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998). The charge here instructed the jury that it should consider certain factors in determining whether the defendant "justifiably relied" (a

32

phrase used only by the conditional omitted instruction) upon the decision of the plaintiff's employer to continue the work despite the condition. Under the controlling standard as outlined in *Scindia* and *Howlett* on the duty to intervene, the absence of the requested language renders the language that was included incomplete and it misplaced the requirement that the defendant ordinarily justifiably relies upon the plaintiff's employer to provide his employees with a reasonably safe place to work in determining whether the plaintiff's employer's judgment is "so obviously improvident" that the defendant should have intervened. The inclusion of the instruction regarding what the jury should consider in determining whether the defendant "justifiably relied" upon the decision of the plaintiff's employer to continue the work despite the condition, necessitated the inclusion of the omitted instruction.[8] The charge as presented to the jury improperly instructed the jury by failing to inform the jury under what circumstances (as provided for in the omitted instruction) the jury should determine whether the defendant justifiably relied upon the decision of the plaintiff's employer to continue the work despite the condition.

Nevertheless, even if we assume that the requested language was necessary to properly instruct the jury regarding the duty to intervene, we must also

---

[8]We make no decision regarding whether or not the trial court should adopt the Fifth Circuit pattern jury instructions for a section 905(b) claim.

determine whether or not the charge error "probably caused the rendition of an improper judgment[.]" Tex. R. App. P. 44.1(a)(1); *Shupe*, 192 S.W.3d at 579-80. To determine whether an alleged error in the jury charge is reversible, we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp.*, 710 S.W.2d at 555; *Tex. Mut. Ins. Co. v. Boetsch*, 307 S.W.3d 874, 880 (Tex. App.—Dallas 2010, pet. denied). We reverse the trial court only when the error in the charge amounted to such a denial of the rights of the complaining party that it probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009).

The instruction the Vessel Defendants requested related to one of the three duties recognized by *Scindia*, and clearly concerned "a contested, critical issue." *Id*. Considering the pleadings of the parties and the nature of this case, the evidence presented at trial, as well as the charge in its entirety, we conclude that the refusal to give the requested instruction was reasonably calculated to and probably did cause the rendition of an improper judgment.

When reversing a trial court's judgment, an appellate court must render the judgment that the trial court should have rendered, except when "the interests of justice require a remand for another trial." Tex. R. App. P. 43.3(b). Generally, a legal sufficiency challenge, if successful, would result in rendition. *Scott Bader, Inc. v. Sandstone Products, Inc.*, 248 S.W.3d 802, 822 (Tex. App.—Houston [1st Dist.] 2008, no pet.). However, an appellate court has broad discretion to remand a case in the interest of justice. *Id*. Resolution of appellants' factual sufficiency challenges in their favor would not result in greater relief under the circumstances of this case, because when, as here, an appellate court decision alters or clarifies the way in which a claim should have been submitted to the jury, the case may be remanded in the interest of justice. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 840-41 (Tex. 2000); *see also Helaire*, 709 F.2d at 1043 (reversing and remanding for a new trial because the jury charge did not restrict Mobil's liability to situations of actual knowledge in accordance with *Scindia Steam Navigation Company*). Because our decision clarifies the manner in which Henderson's section 905(b) claim should have been submitted to the jury, we sustain issue three in part, conclude that the interests of justice require a remand for a new trial, and we need not address that portion of appellants' second issue in which they challenge the

factual sufficiency of the evidence to support the jury's verdict. *See* Tex. R. App.

P. 47.1. We reverse the trial court's judgment and remand for a new trial.

REVERSED AND REMANDED.

_____
LEANNE JOHNSON
Justice

Submitted on May 29, 2014
Opinion Delivered December 18, 2014

Before Kreger, Horton, and Johnson, JJ.