In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00299-CV**

_____

**NATIONAL SECURITY FIRE & CASUALTY COMPANY, Appellant**

**V.**

**RENE LAMPSON AND JUSTINA HENRIQUEZ,**
**Appellees**

**On Appeal from the 136th District Court**
**Jefferson County, Texas**
**Trial Cause No. D-187,954**

**MEMORANDUM OPINION**

We issued a memorandum opinion affirming the trial court's judgment in this cause on October 20, 2016. Appellant National Security Fire and Casualty Company ("National") timely filed a motion for rehearing, which we denied on November 9, 2016. However, we now withdraw our previous memorandum opinion and judgment issued on October 20, 2016, and substitute the following memorandum opinion and judgment in their place. *See* Tex. R. App. P. 19.1(b)

1

(stating that our plenary power over a judgment expires thirty days after all timely filed motions for rehearing are overruled).

National appeals the trial court's judgment in favor of Rene Lampson and Justina Henriquez following a jury trial. In seven appellate issues, National challenges Lampson's standing to sue; Lampson's alleged lack of full ownership of the subject property; the trial court's admission of expert testimony over National's objection; the trial court's refusal to include a jury instruction on spoliation; the legal and factual sufficiency of the damages verdict; the trial court's alleged failure to require appellees to elect a remedy; and the award of attorney's fees to appellees. We affirm the trial court's judgment.

PROCEDURAL BACKGROUND

Appellees Rene Lampson and his wife, Justina Henriquez, sued National, alleging that when Hurricane Ike occurred,[1] their home in Jefferson County, Texas, was damaged.[2] Appellees contended that during the hurricane, their "roof was damaged resulting in interior water damage throughout the residence." In addition, appellees asserted that the house sustained damage to the sheetrock, exterior bricks, and windows, "as well as walls, cabinets[,] and insulation throughout the

---

[1]Hurricane Ike struck Texas on September 13, 2008.

[2]Appellees also sued claims examiner Renee Snellgrove, but Snellgrove is not a party to this appeal.

entire house." According to appellees, the home also shifted during the storm, causing the foundation to be unlevel and the ceilings and walls to crack. Appellees further claimed that their personal property inside the home was damaged and they lost food.

Appellees asserted that they filed a claim for the damages with their insurance company, National, immediately after the storm. According to appellees, National wrongfully denied their claim for repairs, even though their policy provided coverage for losses such as theirs, and National underpaid some of their claims "by not providing full coverage for the damages sustained by Plaintiffs, as well as under-scoping the damages during its investigation." Appellees asserted claims for fraud, conspiracy to commit fraud, breach of contract, unfair settlement practices, failure to promptly pay as required by the Texas Insurance Code, and breach of the common law duty of good faith and fair dealing. Appellees also sought to recover attorney's fees.

The jury found that National failed to comply with the terms of the insurance policy; awarded appellees $50,000 for failure to comply with the coverage for physical damage to the structure, $950 for failure to comply with the personal property provisions of the policy, $750 for failure to comply with the coverage for reasonable repairs, and $5000 for failure to comply with the loss of use provisions,

3

for a total past damages award of $56,700. The jury also found that National knowingly engaged in an unfair or deceptive act or practice that caused damages to Lampson and Justina by failing in good faith to effectuate a prompt, fair, and equitable settlement when liability had become reasonably clear, failed to provide appellees a reasonable explanation of the factual and legal basis in the policy for its denial of their claim, and refused to pay their claim without conducting a reasonable investigation. The jury awarded damages for the unfair practices in the same amounts it had found pursuant to the question on failure to comply with the terms of the policy and also awarded $100,000 damages because the unfair or deceptive practice was committed knowingly.

In addition, the jury found that National failed to comply with its duty of good faith and fair dealing by failing to effectuate a prompt, fair, and equitable settlement when liability became clear and by refusing to pay the claim without conducting a reasonable investigation. The jury awarded $10,000 for appellees' loss of use and enjoyment of their property caused by National's failure to comply with its duty of good faith and fair dealing and found that National committed fraud against appellees. The jury also awarded Lampson and Justina attorney's fees of $152,000 for representation in the trial court, $50,000 for representation in the Court of Appeals, $10,000 for representation at the petition for review stage in the

4

Supreme Court, $15,000 for merits briefing at the Supreme Court, and $10,000 for oral argument and completion of proceedings in the Supreme Court.

The trial court signed a final judgment in which it found that Lampson and Justina were entitled to recover $56,700 for past damages, $10,000 for National's failure to comply with its duty of good faith and fair dealing, and $100,000 because National knowingly committed deceptive acts or practices. The trial court's final judgment awarded the Lampson's attorney's fees of $152,000 for trial representation. In addition, the trial court's judgment awarded $50,000 for representation in the Court of Appeals, $10,000 for the petition for review stage in the Supreme Court, $15,000 for merits briefing in the Supreme Court, and $10,000 for oral argument and completion of proceedings in the Supreme Court, with each award being conditioned upon Lampson and Justina's success during the appellate process. National then filed this appeal from the trial court's judgment.

## THE EVIDENCE

Lampson testified[3] that he married Justina[4] on March 20, 1966, and they have five children. Lampson explained that he purchased the home for $46,000 in

---

[3]Lampson testified via an interpreter.

[4]Justina testified that she became a permanent resident of the United States eight years ago. Prior to that time, she traveled back and forth between Nicaragua and the United States. Justina was in Nicaragua when Hurricane Ike struck.

5

1998 by obtaining a ten-year mortgage, and Lampson explained that he had paid off the mortgage by approximately 2008. Lampson testified that his daughter's name was on the deed during 2007 and 2008. Lampson explained that he put his daughter's name on the deed when he purchased the home because his wife was in Nicaragua at that time, and "anything could happen[,]" and he put his wife's name on the deed when she returned to the country.

In 2007, Lampson purchased an insurance policy from National that provided coverage of $50,000, and he paid the premiums on the policy. Lampson testified that National inspected the home in 2007, before Hurricane Ike occurred. According to Lampson, Hurricane Ike caused some new cracks in the home's brick, broke six windows, caused the floor to become unlevel and to crack, and caused the roof to leak. In addition, the garage door sustained wind damage, and water entered the home. Lampson testified that he had to replace a sofa and a refrigerator. In addition, Lampson and his family evacuated to Lufkin, where they stayed in a hotel for approximately one week. According to Lampson, after his home was inspected, National sent him a letter denying his claim. After National denied Lampson's claim, Lampson contacted Southeast Texas Regional Planning Commission ("SETRPC"), and SETRPC paid to tear down Lampson's home and build a new house. Lampson testified that any photographs he had of his home

6

before Hurricane Ike struck were no longer in his possession, and he did not recall whether he removed the pictures from the house before SETRPC demolished it.

Shanna Burke, the director of SETRPC's Disaster Recovery Division Program, testified that Lampson applied for assistance in March of 2010. As part of the application, Lampson signed a subrogation agreement. SETRPC sent an inspector to the home in October of 2010, and the inspector concluded that "[d]ue to high winds, there was extensive foundation, structural, electrical, plumbing, mold, and roof damage." SETRPC determined that the cost of repairing Lampson's home would exceed SETRPC's $85,000 cap, so SETRPC decided to demolish the home and build a new one.

Almus Shively, claims manager for National during the aftermath of Hurricane Ike, testified that National provided insurance to Lampson in the amount of $50,000 for the dwelling, $5000 for other structures, $20,000 for personal property on the premises, and $1000 for personal property off the premises. As part of the underwriting process, National inspected and photographed Lampson's property. According to Shively, a June 2007 "photo report" in National's file indicated that there was a four-foot crack "on exterior wall on right[,]" windows at the rear of the house were boarded, and there was "possible mildew" on the siding on the front and left side of the house. National decided to provide coverage to

7

Lampson. Shively testified that after the hurricane, there were additional cracks and broken windows that were not present in the photos from the underwriting file.

National memorialized Lampson's claim in a written Property Loss Notice, dated September 29, 2008. After Hurricane Ike occurred, National utilized an outside adjusting firm, IAS Claims Service, Inc., to handle claims, including Lampson's. Jack Fielder, an independent adjuster from IAS, inspected Lampson's home on October 14, 2008, and provided a written report to National. In the report, Fielder stated that three windows were broken; the garage door was damaged; the roof was in good condition, and there was no evidence that it leaked; and there were "some large cracks in the brick veneer that appear new, but [Fielder] could not be sure if they [were] related to the wind storm." Fielder's report also recommended that the file be closed without any payment being made because the loss, which Fielder estimated as $572.66, did not exceed Lampson's $1000 deductible. According to Shively, Fielder's report also stated that any roof leaks were due to flashing that was not installed, but Shively testified that there was nothing in the underwriting file regarding a lack of flashing on the roof. Shively testified that Fielder's report was transmitted to National's claims examiner.

According to Fielder, he noted in his report the insured claimed the house was unlevel. Fielder observed cracks that appeared to be new, and noted in his

8

report, "if you wish to pursue this matter further, . . . I leave it to your discretion." Fielder explained that he is "not qualified" to determine whether the cracks in the brick were due to hurricane-force winds. When asked whether he went inside the home to see if there was water damage, he responded, "I don't remember, but I went in the house." Fielder testified that he only photographed the bathroom area. Fielder did not recall going into any area inside the home except the bathroom. Fielder explained that he got onto the roof of the home, "went underneath" the tarp, and took approximately six photographs. Fielder testified that he did not photograph the area where water came in and was observed inside the house, and he testified "I don't know" when asked whether water came inside the house from the area underneath the tarp. Fielder testified that he merely noted in his report that there was a lack of flashing, and he did not attribute the damage to the lack of flashing. Fielder explained that he did not document whether there was interior water damage as a result of the broken windows.

After receiving Fielder's report, National denied Lampson's claim in a letter, dated October 24, 2008. The letter stated, "We have learned from our adjuster's report that the cost to repair the damage to your dwelling will be less than the deductible in your policy. Under the circumstances, no payment can be made for this claim. . . . We will be glad to consider anything you would like to submit[.]"

Shively testified that he approved the issuance of the denial letter, which was signed by claims examiner Renee Snellgrove.

Phil Spotts testified as an expert witness regarding claims adjusting and handling. Spotts testified that he is a part owner of an insurance claims consulting company, which he founded in 1991. Spotts explained that he has worked in the adjusting field for thirty-five years. Spotts testified that for twenty-five years, he has held an all-lines Texas adjuster's license, which allows him to handle any type of claim. Spotts also "studied and received designations from the Insurance Institute of America, including associate in claims, associate in risk management and chartered underwriter, which is considered to be the highest designation in the insurance industry." According to Spotts, CPCU (chartered property casualty underwriter) is the highest level of specialized education in the field of insurance adjusting, and Spotts had to take ten rigorous exams over a period of several years to achieve that designation. Spotts testified that he received the CPCU designation in 1993.

Spotts explained that he has been involved in adjusting insurance claims from eighteen hurricanes, has trained over one hundred adjusters, and has an extensive background in claims handling. Spotts estimated that he has been involved in the handling or supervision of over 100,000 claims. Spotts testified:

A claims adjuster is really the only advocate that the homeowner has. I mean, if you think about it he has a little bit of conflict of interest because he is getting paid by the insurance company, but it's his job to make sure that he analyzes all of the damage that could have occurred in a hurricane, right? If not him then who, right? So it's critically important for the claims adjuster to know the coverage, be a great communicator, know how to estimate the costs of any repairs . . . based on whatever the going rate in that town is at that time and then communicate that with the insured. Those are critical elements in any claim adjustment. . . . He is the only one really who can help the insured in a time of distress after a hurricane and it's critically important that he take enough time to properly do his job and analyze all the damage at that property.

According to Spotts, an adjuster should question an insured about such issues as whether he had to evacuate, where he went, how long he was gone, how the house looked when the insured returned, whether the power was off and for how long, and whether the insured lost food. Spotts explained that the claim file "is meant to document all of the activities on a claim and so it should read like a book." Spotts testified, "I should be able to pick up this claim file two years later and understand exactly what happened on this claim. And if I can't do that, then this claim file is not very well documented[.]" Spotts testified, "in reading this claim file it didn't answer very many of my questions, but it sure asked a whole lot more questions that we're trying to find the answers to here[.]"

Spotts explained that he was asked to review and provide an opinion on the claims handling in Lampson's case. According to Spotts, the claims file does not

11

reflect that a full copy of Lampson's insurance policy was ever provided to Fielder, and Spotts testified that the policy may contain coverage information that is not reflected on the declarations page. Spotts testified that Lampson's policy has additional endorsements and other additions that Fielder could not know about without reading the policy. According to Spotts, Fielder's level of communication with Lampson could not have been very effective due to the language barrier, and Spotts testified, "my review of the claim file . . . did not indicate a very high level of communication or understanding between the adjuster and the homeowner." Spotts explained that when an independent adjuster encounters someone who does not speak English well, the adjuster should inform the insurance company that he is unable to communicate with the insured and ask for either a hired interpreter or a family member of the insured to assist him.

Spotts noted that Fielder's report stated that the loss was due to hail rather than a hurricane, and he opined that such an error "just goes to attention to detail, being in a hurry." Spotts explained that Lampson had reported four areas of concern to National: roof damage, leaking inside the home, damaged windows, and the fact that the home was unlevel. According to Spotts, the adjuster "should be inspecting those and determining whether those things were legitimately damaged by the hurricane. That's his job." Spotts opined that Fielder did not adequately

12

investigate any of those four areas. Spotts saw no evidence that Fielder did a thorough inspection underneath the tarp on Lampson's roof. According to Spotts, Fielder should have taken "an extra special look at that area of the roof to see if any of those shingles have been detached by wind in a hurricane, maybe laid back down, or if there is another problem up there that could have created this leaking inside the house."

When asked what Fielder concluded with respect to the leak, Spotts testified, "I didn't see that he actually investigated the leak inside the house because there weren't any photos." Spotts explained that the only photographs from inside the home were two photographs of the bathroom, and he testified that there are no scope notes, activity records, or photographs to indicate that Fielder inspected the leak on the ceiling. According to Spotts, an adjuster's job is to find the spot on the ceiling where water is coming in and then figure out where it is coming from, and nothing in the file indicates that Fielder did so. Spotts testified that Fielder should have tested some shingles in a representative area by seeing if he could lift them up. Spotts explained that although a roof may appear undamaged, it may be unsealed.

With respect to the broken windows, Spotts testified that Fielder allowed Lampson $55.44 for each broken window, and he explained:

13

> I don't have a problem with the price of the glass. The issue I have, based on my experience, . . . these are 50-year old windows that aren't in the world's greatest condition to begin with, so to think that you can replace the glass in these wood windows without replacing the window sash is, in my opinion, unreasonable. It just can't be done. You['ve] got to take that wood off to put the glass in and put new wood back and then you have to paint it to match what it looked like before. He didn't pay for any of that, plus Mr. Lampson boarded up the windows, which he is required to do under the terms of the policy to protect the house from further rain and [Fielder] didn't pay for that either. And how much damage did that cause that had to be repaired that was never paid for or considered? So maybe he got the glass part right, but he missed on all the other stuff that . . . should have gone with that.

According to Spotts, Fielder did not investigate or photograph the inside of the windows that broke in the hurricane to determine whether there was water damage. With respect to the house being unlevel and having cracks, Spotts testified that "an adjuster is not qualified, in my opinion, to make coverage determinations on foundation issues that are this complicated." In addition, Spotts explained that the claim file does not indicate that Fielder's estimate was ever provided to Lampson. Spotts opined that Fielder "was in a hurry" and "didn't take enough time to do his job." Spotts testified:

> [T]ypically what I found through studying fee schedules is that the most efficient fee schedule for an adjuster to make the most money is that first layer. Going out, looking at a loss quickly, closing the claim quickly[,] and getting paid for it quickly provides the greatest incentive for the adjuster [to] get paid quickly. Unfortunately, it doesn't provide the greatest incentive of service to the insured because

14

when you are working and you are in a hurry, you are going to make mistakes[.]

Spotts explained that there is an economic incentive for field adjusters to hurry to complete a claim, and that fact "doesn't lead to great service." When asked whether Lampson failed to do anything that National required of him, Spotts testified, "According to my review of the claim file and all the other documents I have been provided, I saw no evidence that Mr. Lampson did anything in violation of the insurance policy[;] in fact, he went further by providing those temporary repairs . . . to prevent further damage[.]"

Engineer Terry Shipman of the Fittz and Shipman engineering firm in Beaumont testified that he has a Master of Science degree in civil engineering, and he explained that his firm provides "general civil engineering, land survey, and structural engineering services."[5] According to Shipman, structural engineering is a subset of civil engineering. Shipman explained that the structural division of his firm does "the foundation design and the structural frame for buildings that [architects] are designing, anywhere from residential to multi-story buildings." Shipman testified that any opinions about which he would testify would be based

---

[5]Before Shipman's testimony, National's counsel stated, "it's our belief that the trial court cannot re-visit our *Daubert/Robinson* challenge of Mr. Terry Shipman pursuant to the multi-district litigation rules and we want the record to reflect that we re[-]urge it but it's our belief that the trial court . . . cannot re-visit it."

15

on his education and training as a structural engineer and would be based on reasonable engineering probabilities.

Lampson's attorneys retained Shipman to inspect the home after Hurricane Ike, and Shipman provided a report. Shipman testified that "rather than sending an engineer or myself . . . to inspect the property, we had our field inspector, Don Burrell, go out and inspect the property, [and] generate the report for my review and signature." Burrell inspected the property on December 14, 2010. Shipman explained that it is less expensive to send Burrell than if Shipman personally did the inspection, but if Shipman felt it was necessary to investigate further, his agreement with Lampson's counsel permitted him to do so. Shipman estimated that he has handled more than one hundred files by sending an inspector. Shipman testified that he believed he discussed Burrell's report with Burrell before signing it, but he could not "say for certain."

Shipman explained that Burrell inspected the home, took photographs, and reported back to Shipman. According to Shipman, Burrell has an associate degree in construction science technology, and Burrell previously worked for the City of Beaumont's code enforcement department for twenty-two years, and for "either 6 or 8 of those years he was the building official with the City of Beaumont." Shipman explained that before Burrell became the building official, "he did go out

and inspect properties for code compliance. After he became the building official, in addition to doing some of that, he would inspect properties that were damaged and would recommend to the city council that they be condemned and demolished."

According to Shipman, Burrell noted that there were broken window panes and cracks in the brick façade of Lampson's home. Shipman explained,

> [T]here's a brick wainscot around a portion of the house and the brick wainscot shifted during the hurricane event and there were new cracks in the brick wainscot that were not there prior to the hurricane event. And that is just an indication that the foundation shifted during the event.

Shipman testified that Burrell also noted that a door was no longer functioning, and according to Shipman, "[t]hat means the foundation has shifted. The frame has become out of align relative to the door. Therefore, the door is either stuck shut or it's very difficult to open and close." Shipman testified that Burrell's observation that the kitchen floor noticeably sloped toward the middle of the structure also indicates that the foundation has shifted and the floor has become unlevel. Shipman explained that when the foundation has shifted and the floor has become unlevel, interior sheetrock cracks occur and doors may not work properly.

When asked to explain how a pier and beam home such as Lampson's could be shifted by a hurricane, Shipman testified:

> [T]he storm didn't last just a few minutes. It was the long-term storm. . . . There was also a significant amount of rainfall which softened the soils; and during the worst part of the storm, about every 3 seconds or 5 seconds, a gust of wind would hit the house. The house would shudder. It would shake. Due to the softened soils, pressures would be put on the piers that were supporting the foundation and they would sink a little bit. And every few seconds another gust would hit it and little bit more would go down. The house would shudder, shake, possibly become distorted a little bit as the wind pressure hit it, depending on the angle and the magnitude of the wind.

Shipman explained that the storm caused the cracks in the wainscot around the house, and that he had reviewed data from the National Weather Service in formulating his opinion. In addition, Shipman testified that he used a site-specific wind analysis made by CompuWeather for another house he analyzed, which was located approximately one mile from Lampson's house. According to Shipman, CompuWeather is an online weather service that has a forensic division which, when provided with an address, will perform a forensic analysis of the weather events at that address. Shipman explained that said data was relevant to Lampson's home, and he testified:

> [T]he data from CompuWeather indicated that the house experienced a maximum gust of 97 miles per hour. The wind[s] exceeded Category 1 hurricane force winds for 4 hours. The winds exceeded tropical storm force winds for 22 hours, and it also indicated 6.5 inches of rain in a 23-hour period.

Shipman also explained that, "[b]ased on the 97 [m]ile per hour maximum gust that CompuWeather reported, the wind pressures on the Lampson property

18

varied from 32 to 75 pounds per square foot." According to Shipman, the pressures at the corners, ridge lines, and eaves are higher, and the pressure on the interior portion of the walls is lower. In addition, Shipman explained that pressures from thirty-two to seventy-five pounds per square foot are of sufficient magnitude to structurally move Lampson's pier and beam home. Shipman explained that, after providing his report, he saw pre-Hurricane Ike photographs of Lampson's home from National's underwriting file, and he explained that the additional photographs confirmed his opinion. Shipman also testified that the findings of the inspector from SETRPC matched Shipman's own observations and conclusions regarding the home.

Additionally, Shipman testified that one of Burrell's photographs from the December 2010 inspection showed what appeared to be a new crack, and Shipman explained that he believed the crack was new because there was "not debris build up in the crack. The brick had been painted. There was no paint in the crack. The edges of the mortar where the mortar had cracked was sharp. The crack looked fresh." Shipman also noted in his report that at least seven panes had blown out of windows in the home, which indicates significant wind pressure as well as flying debris. Shipman also testified that the broken panes indicate that "the outside

19

envelope of the house was broken. Therefore, wind was able to enter the house. Pressures tend to go up when that happens."

Attorney Randy Cashiola testified regarding Lampson's attorney's fees. Cashiola explained that Lampson's attorneys could only recover their fees if Lampson prevails in the lawsuit. Cashiola testified that the rates charged are reasonable, reflective of the risk involved in taking the case, and are commensurate with the lawyers' skills. According to Cashiola, the rates are reasonable for the area of first-party insurance law, as well as for the Jefferson County area.

Cashiola explained that after the case was filed in Jefferson County, it was moved to Harris County for a time during the pretrial phase as part of the multidistrict litigation (MDL) pretrial procedure,[6] which necessitated more travel time for the attorneys. In addition, Cashiola testified that taking Lampson's case precluded Lampson's attorneys from accepting some other cases. Cashiola testified that $160,145 in attorney's fees had been incurred, and he explained that attorney's fees were accruing during trial at the rate of approximately $6000 per day. Cashiola explained that appellate attorneys charge approximately $500 per hour, and he anticipated that fees for an appeal to this Court would be $50,000, and fees for an appeal to the Texas Supreme Court would be $10,000 for the petition for

---

[6]The case was transferred to the MDL court pursuant to National's motion requesting the transfer. *See* Tex. R. Jud. Admin. 13.3.

review stage, $15,000 for the briefing stage and $5000 for oral argument. National did not call any witnesses, and both National and Lampson rested at the conclusion of Lampson's evidence.

## ISSUE TWO

In issue two, National argues that Lampson lacks standing to sue National because he "assigned all rights of recovery, including the National Security insurance policy, to the [SETRPC][.]" Because this issue, if sustained, would result in reversal of the trial court's judgment and dismissal of the appeal, we address it first. *See* Tex. R. App. P. 47.1; *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 149-50 (Tex. 2012); *Speer v. Stover*, 685 S.W.2d 22, 23 (Tex. 1985).

Although Lampson questions whether National, as a stranger to the contract, has standing to assert SETRPC's rights, we will address Lampson's standing as briefed by National in issue two rather than ruling upon National's standing. National presented its motion to dismiss to the MDL court in Harris County, in which it asserted that the Lampsons lack standing, and after the MDL Court denied the motion to dismiss, National re-urged the motion before the trial court. The trial court signed an order denying National's motion to dismiss. In its order, the trial court stated, "In an effort to circumvent an emergency interlocutory appeal filing on the day of trial, it is this Court's opinion that the MDL Court's denial of

21

Defendant's Motion to Dismiss for Lack of Jurisdiction be reiterated in the trial court."

As discussed above, Lampson and SETRPC entered into a "Subrogation and Assignment Agreement[.]" The agreement identified Lampson as the borrower and SETRPC as the "Subrecipient[,]" and stated that Lampson "hereby assigns to [SETRPC] all of [Lampson's] future rights to reimbursement and all payments received under any policy of casualty or property damage insurance . . . for physical damage to the Structure[.]" The agreement also provided: "Borrower agrees to assist and cooperate with the Subrecipient should the Subrecipient elect to pursue any of the claims Borrower has against the Insurers for reimbursement under any such policies. Borrower's assistance and cooperation shall include allowing suit to be brought in Borrower's name(s)[.]"

To determine whether Lampson had standing to bring his claims against National, we must examine the subrogation and assignment agreement. We construe the subrogation and assignment agreement by giving the language therein its plain meaning. *Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 615 (Tex. App.—Houston [1st Dist.] 2005, no pet.). In construing a contract, we must consider the instrument as a whole rather than give controlling

22

effect to a single provision. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

> If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered.

*Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983) (citations omitted).

We conclude that the plain language of the subrogation and assignment agreement indicates that Lampson was assigning to SETRPC the funds recovered from his insurance policy with National (as well as from any other sources, such as FEMA). The agreement gave SETRPC the right to bring a lawsuit in Lampson's name, but not the exclusive right to do so, and nowhere does the agreement refer to assignment of a *cause of action* by Lampson. *See generally id*. Applying the rules of contract construction and reading the agreement as a whole, we conclude that the agreement's purpose was to insure that SETRPC would recoup the money it spent on Lampson's property from any money Lampson received from National or other sources. Because Lampson did not assign the exclusive right to assert a cause of action regarding the property to SETRPC, the trial court did not err by denying National's motion to dismiss. Accordingly, we overrule issue two.

23

## ISSUE ONE

In issue one, National argues that the jury "necessarily" answered several questions of the charge incorrectly because, according to National, Lampson only owned a one-half interest in the insured structure. Specifically, National asserts that because Lampson's daughter's name appears on a deed, dated November 19, 2010, in which she conveyed an unspecified interest in the property to Lampson for "Ten dollars ($10.00) cash and other good and valuable consideration[,]" Lampson only owned one half of the property before that date. In addition, National contends that Lampson's wife "clearly has no ownership, has no claim on which damages can be awarded[,] and is not entitled to an award of attorney's fees."

As explained below, National's argument contradicts well-established principles of community property law, as well as the evidence adduced at trial. Lampson testified that he married his wife in 1966 and purchased the home in 1998. No evidence to the contrary was introduced. The 1998 deed simply reflects that Lampson and his daughter Chirly were the purchasers of the property and that they had paid $26,000 to the sellers via two promissory notes. Lampson testified that he added his daughter to the deed to his home because his wife was living in Nicaragua and "anything could happen[,]" and Lampson explained that he changed

24

the title to reflect Justina's name when she returned to the country. There was no evidence adduced to indicate that Lampson intended to convey any interest to Chirly when he put her name on the deed.

There is a presumption under Texas law that property possessed or acquired by either spouse during the marriage is community property, and to prove that particular property is separate property requires clear and convincing evidence. Tex. Fam. Code Ann. § 3.003 (West 2006); *see Gameson v. Gameson*, 162 S.W. 1169, 1171 (Tex. Civ. App.—Austin 1913, no writ). As discussed above, the evidence established that Lampson purchased the home during the marriage, and there was no evidence that Lampson intended to convey any interest to Chirly or that Chirly contributed any funds toward the purchase of the home. The evidence adduced at trial was insufficient to rebut the presumption that the house was community property. *See* Tex. Fam. Code Ann. § 3.003; *Gameson*, 162 S.W. at 1171. Therefore, because the home was community property, Lampson and Justina each owned an interest in the home. *See generally Patterson v. Twaddell*, 301 S.W.2d 680, 683 (Tex. Civ. App.—Amarillo 1957, writ ref'd n.r.e.).

In its brief, National also quotes a portion of the insurance policy, which states that it will not be liable to the insured for more than the amount of the insured's interest at the time of the loss. As discussed above, Lampson and Justina

owned the home as community property when Hurricane Ike struck. For the same reasons discussed above, we reject National's argument and overrule issue one.

## ISSUE THREE

In issue three, National complains that the trial court erred by allowing Shipman to testify because Shipman did not inspect the property, take any photographs, and "did not even write his 'own' expert report." National asserts that it was "substantially prejudiced" by the admission of Shipman's testimony over its objection.

Under Rule 702 of the Texas Rules of Evidence, the party seeking to admit expert testimony must establish that (1) the expert is qualified to render an opinion on the subject matter and (2) the testimony is relevant to the issue in the case. Tex. R. Evid. 702; *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010). Expert testimony must rely on sufficient data and proper methodology. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 905-06 (Tex. 2004); *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 257 (Tex. 2004). "An expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed." Tex. R. Evid. 703.

"An expert's bare opinion will not suffice." *Ramirez*, 159 S.W.3d at 906. If the analytical gap between the offered opinion and the underlying data is too great,

26

the expert testimony is unreliable. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007); *see Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). A trial court must act as a gatekeeper to screen out unreliable expert evidence. *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 590 (Tex. 1999); *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556-57 (Tex. 1995). The examination of an expert's methodology, technique, or foundational data is a task for the trial court in its role as gatekeeper. *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). A *Robinson* determination is "not an analysis that should be undertaken for the first time on appeal." *Id.* Requiring the trial court to first address the issue insures that a full record will be developed and an appellate court will be able to evaluate the sufficiency of the evidence without looking beyond the appellate record. *Id.*

Shipman testified regarding his credentials, as well as those of Burrell, and he stated that all of his testimony would be based upon his training as a structural engineer, as well as reasonable engineering probabilities. As discussed above, Shipman estimated that he has handled more than one hundred files by sending an inspector, such as Burrell, to the site. Burrell photographed and described in the report the damage to Lampson's home, and Shipman explained how he used data from CompuWeather to calculate the range of wind pressures to which Lampson's

27

property was exposed during the hurricane. Shipman testified regarding the damage depicted in Burrell's photographs, and he explained how the length and force of the storm, as well as the amount of rain, caused the house to shake and "possibly become distorted[.]" Shipman further explained the basis for his belief that the cracks in the brick were new, and he testified that the broken windows indicated significant wind pressure and flying debris.

We conclude that Shipman's testimony did not merely consist of his bare opinion; rather, it was supported by sufficient data and proper methodology and was not conclusory. *See Ramirez*, 159 S.W.3d at 905-06; *Helton*, 133 S.W.3d at 257. In addition, we conclude that National's complaint that Shipman did not personally inspect the property, photograph it, or personally write the report is without merit. *See* Tex. R. Evid. 702; *Schronk v. City of Burleson*, 387 S.W.3d 692, 716 (Tex. App.—Waco 2009, pet. denied) (holding that a testifying expert need not have personally inspected an object before offering testimony about the object). For all of these reasons, we overrule issue three.

## ISSUE FOUR

In issue four, National contends that the trial court abused its discretion by refusing to submit the spoliation instruction National requested. National argues that the condition of the property before and after Hurricane Ike was "critical

physical evidence[,]" yet Lampson "allowed the structure to be demolished, together with photographs of the [structure's] pre and post Hurricane Ike condition[.]"

In *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9 (Tex. 2014), the Texas Supreme Court held that because a spoliation instruction is based on a presumption of wrongdoing rather than mere negligence, "a party must intentionally spoliate evidence in order for a spoliation instruction to constitute an appropriate remedy." *Aldridge*, 438 S.W.3d 9, 23-24. The Supreme Court explained that "[b]y 'intentional' spoliation, often referenced as 'bad faith' or 'willful' spoliation, we mean that the party acted with the subjective purpose of concealing or destroying discoverable evidence." *Id*. at 24. Accordingly, the Court held that "a trial court's finding of intentional spoliation . . . is a necessary predicate to the proper submission of a spoliation instruction to the jury." *Id*. at 25. The Supreme Court qualified its broader holding by providing a means for the trial court to give a spoliation instruction "if the act of spoliation, although merely negligent, so prejudices the nonspoliating party that it is irreparably deprived of having any meaningful ability to present a claim or defense." *Id*. at 25-26.

The record reflects that Lampson filed a claim with National for his damages from Hurricane Ike on September 29, 2008, applied for assistance from SETRPC

29

on March 5, 2010, filed suit against National on September 3, 2010, and SETRPC demolished the home in May of 2012. Nothing in the record before us suggests that Lampson intentionally spoliated any evidence by allowing SETRPC to demolish the house, nor does the record suggest that the alleged spoliation deprived National of any meaningful ability to present a claim or defense; rather, the record reflects that National vigorously defended itself, and that National had inspected and photographed the home in 2007 during the underwriting process. We conclude that the trial court did not err by refusing to submit National's requested spoliation instruction. In addition, we note that National has not established that the refusal of the instruction probably led to the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). For all of these reasons, we overrule issue four.

## ISSUE FIVE

In issue five, National appears to argue that the evidence was legally and factually insufficient to support the damages verdict. National briefs the issue by asserting its challenges to the sufficiency of the evidence concurrently with complaints about the denial of its requested jury questions on causation, policy defenses, and spoliation. National also includes in its discussion of issue five an oddly-placed argument regarding Lampson's alleged failure to fulfill his duties under the policy to (1) provide prompt written notice of the facts relating to the

claim, (2) protect the property from further damage, (3) make reasonable and necessary repairs to protect the property, (4) keep an accurate record of the repair, (5) allow National access to the property as often as National reasonably requires, and (6) provide pertinent documents and records upon request.

National does not discuss the standards of review for legal and factual sufficiency of the evidence or explain how the evidence was insufficient. *See* Tex. R. App. P. 38.1(i). National does not explain how its arguments regarding the jury charge relate to its challenge to the legal and factual sufficiency of the evidence as to damages; rather, National seems to make a separate argument regarding the refusal of its requested instructions regarding causation, Lampson's duties under the policy, and spoliation.

In a legal sufficiency review, we are to "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id*. We will sustain a legal sufficiency challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or rules of evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital

31

fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact that is at issue in the appeal. *Id.* at 810. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Kroger Tex. Ltd. P'Ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)). The jury is the sole judge of the credibility of the witnesses and is responsible for resolving any conflicts in the evidence, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *City of Keller*, 168 S.W.3d at 819-21; *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004).

In a factual sufficiency review, we consider and weigh all of the evidence, and we will set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). As long as the evidence falls within the zone of reasonable disagreement, we cannot substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 822.

National argues that the only causation testimony came from Shipman, and National also complains that because Hurricane Rita damaged Lampson's house

prior to Hurricane Ike, the trial court erred by refusing its requested jury question regarding whether Hurricane Ike caused the damage to Lampson's property. As previously discussed, after Hurricane Rita occurred,[7] National inspected Lampson's home and photographed it, and National's underwriters decided to insure the property.

In addition to Shipman's testimony, which we will not reiterate here, the jury also heard evidence from Lampson regarding the damage Hurricane Ike inflicted upon the property. Specifically, Lampson testified that Hurricane Ike caused new cracks in the brick, broke six windows, caused the floor to become unlevel and to crack, caused the roof to leak, damaged the garage door, and allowed water to enter the home. Lampson also testified regarding items he had to replace, as well as his family's evacuation to a hotel for about one week. Lampson testified that he had to spend one week in a hotel during the evacuation, had to replace a refrigerator and a sofa, and that he lost food. In addition, Lampson testified that his home cost $46,000 when he purchased it in 1998, and Burke testified that SETPRC determined that it was more cost efficient to demolish the home and rebuild rather than to repair it because the repair cost would have exceeded SETRPC's $85,000 cap. The jury also heard Shively testify that there

---

[7]Hurricane Rita made landfall on September 24, 2005.

were cracks and broken windows in the post-hurricane photos that did not appear in the photographs National took in 2007.

With respect to the award of damages for National's knowingly committing unfair or deceptive trade practices, the jury heard evidence from Spotts that National's claim file was not well documented; National apparently did not give Fielder a copy of Lampson's insurance policy; Fielder did not communicate effectively with Lampson or seek assistance from an interpreter; Fielder did not adequately investigate any of the four areas of concern reported by Lampson; and Fielder was in a hurry and did not take sufficient time to do his job. The jury heard evidence that National accepted Fielder's report and denied Lampson's claim without further investigation.

Crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the evidence would enable reasonable and fair-minded people to reach the damages verdict and, therefore, is legally sufficient. *See City of Keller*, 168 S.W.3d at 827. Furthermore, considering and weighing all of the evidence, we conclude that the evidence is not so weak nor is the finding so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Francis*, 46

34

S.W.3d at 242. Therefore, the evidence is factually sufficient. Accordingly, we overrule the legal and factual sufficiency challenges raised in issue five.

We now turn to the charge error arguments alleged within issue five. The trial court shall submit instructions and definitions as shall be proper to enable the jury to reach a verdict and which are raised by the written pleadings and the evidence. Tex. R. Civ. P. 277, 278. We review alleged jury charge error under an abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g); *Lake Conroe Med. Ctr., Ltd. v. KMT Bldg. Co.*, 290 S.W.3d 541, 548 (Tex. App.—Beaumont 2009, no pet.). We may not reverse for charge error unless the error "probably caused the rendition of an improper judgment[.]" Tex. R. App. P. 44.1(a)(1); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). To determine whether an alleged error in the jury charge is reversible, we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Rep. of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). To be included in the charge, a question or instruction must be supported by the pleadings and the

evidence. *See* Tex. R. Civ. P. 278; *Thota v. Young*, 366 S.W.3d 678, 693 (Tex. 2012).

National's first charge complaint in issue five concerns the rejection of its proposed jury question, which inquired whether Hurricane Ike caused the alleged windstorm damage. National asserts that because Lampson's home had been previously damaged in Hurricane Rita, the charge on causation was required. As discussed above, Lampson testified that Hurricane Ike damaged his home and explained in detail the extent of the damage, and National had in its underwriting file pictures of the home's condition in 2007, which was after Hurricane Rita but before Hurricane Ike. Shipman testified in detail regarding the forces to which Lampson's home was exposed during the storm and the resulting damages to the structure. No witnesses testified that Hurricane Ike did not damage Lampson's home.

We conclude that the proposed instruction was not supported by the evidence, and the trial court therefore did not abuse its discretion by refusing to submit it. *See* Tex. R. Civ. P. 278; *Thota*, 366 S.W.3d at 693. In addition, National has not demonstrated that the trial court's refusal of its requested instruction probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Shupe*, 192 S.W.3d at 579.

In its next charge error argument, National complains of the trial court's refusal to submit its proposed question that set forth all of Lampson's duties pursuant to the insurance policy and asked the jury to determine whether Lampson had fulfilled those duties. The evidence established that National had received notice of Lampson's claim by September 29, 2008, and denied Lampson's claim on October 24, 2008, after receiving Fielder's report. In addition, Spotts testified that Lampson did not violate the insurance policy, and that Lampson made temporary repairs to prevent further damage to the property. National's proposed question inquired about issues upon which there was no evidence, such as Lampson allowing National access to the property until its demolition, providing prompt notice, and providing documents upon request. Because National's proposed issue included issues not supported by the evidence, the trial court did not abuse its discretion by refusing to submit it. *See* Tex. R. Civ. P. 278; *Thota*, 366 S.W.3d at 693. In addition, National has not demonstrated that the trial court's refusal of its requested instruction on Lampson's obligations under the policy probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Shupe*, 192 S.W.3d at 579.

In its final charge error argument, National again contends that the trial court erred by refusing its requested instruction on spoliation. We have already

37

addressed the refusal of a spoliation instruction in our analysis of issue four, and we need not repeat that analysis here. For the same reasons discussed in issue four, we overrule National's argument in issue five regarding the trial court's refusal to submit National's proposed spoliation charge. Having addressed all of the multifarious arguments raised in issue five, we overrule issue five.

## ISSUE SIX

In issue six, National asserts that the trial court failed to require Lampson to elect a remedy, and that Lampson cannot recover "under both his statutory claims and his breach of contract claim." As discussed above, the jury awarded actual damages totaling $56,700 in response to both Question 2, which dealt with breach of contract, and Question 5, which dealt with unfair or deceptive acts by National. The record reflects that appellees filed a motion for entry of final judgment on March 2, 2015, with which they submitted a proposed final judgment. Appellees' proposed final judgment included a single finding of past damages of $56,700, as well as $10,000 for National's failure to comply with its duty of good faith and fair dealing and $100,000 for National's knowing engagement in unfair or deceptive acts or practices. The trial court signed its final judgment in accordance with the requests made in appellees' proposed final judgment. Therefore, appellees did not recover twice for the same injury. *Cf. Waite Hill Servs. v. World Class Metal*

38

*Works*, *Inc.*, 959 S.W.2d 182, 184-85 (Tex. 1998) (holding that when technically differing acts cause the same injury, the one satisfaction rule prohibits the plaintiff from recovering the same damages twice).

National also complains that appellees "failed to segregate the covered from the uncovered losses." National's brief contains no explanation of what losses National contends were not covered; therefore, said argument is inadequately briefed, and we need not address it. *See* Tex. R. App. P. 38.1(i). For all of these reasons, we overrule issue six.

ISSUE SEVEN

In issue seven, National argues that the attorney's fees award was "wholly unsupported in fact and law and amounted to a recovery based on *ipse dixit* testimony[,]" and National also asserts that the trial court erred by overruling its objections to jury Question 10, which dealt with attorney's fees. National complains that appellees' "proof of attorney's fees . . . was a reconstituted spreadsheet itemizing the time performed on specific tasks[,]" and points out that Cashiola testified that appellees' counsel did not keep contemporaneous time records.

We generally review an attorney's fee award for an abuse of discretion. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004). "Even though

the appropriate standard of review is abuse of discretion, we may nevertheless review a fee award for sufficiency of the evidence." *Cordova v. Sw. Bell Yellow Pages, Inc.*, 148 S.W.3d 441, 446 (Tex. App.—El Paso 2004, no pet.). The lodestar method of determining what constitutes a reasonable attorney's fee involves two steps: (1) determining the reasonable hours spent by counsel and a reasonable hourly rate for such work, and (2) multiplying the number of such hours by the applicable rate, "the product of which is the base fee or lodestar." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). "[A] party applying for an award of attorney's fees under the lodestar method bears the burden of documenting the hours expended on the litigation and the value of those hours." *Id.* at 761. Sufficient evidence should include, "at a minimum, documentation of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required." *Id.* at 764. Contemporaneous evidence may be unavailable, but it is permissible for attorneys to reconstruct their work to provide the factfinder with sufficient information. *Long v. Griffin*, 442 S.W.3d 253, 256 (Tex. 2014).

As Cashiola acknowledged during his testimony, the Supreme Court has set forth a list of eight factors that the factfinder should consider when determining the reasonableness of attorney's fees. *Arthur Andersen & Co. v. Perry Equip. Corp.*,

945 S.W.2d 812, 818 (Tex. 1997). In *Arthur Andersen*, the Supreme Court held that the factors the factfinder should consider are:

1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;

3) the fee customarily charged in the locality for similar legal services;

4) the amount involved and the results obtained;

5) the time limitations imposed by the client or by the circumstances;

6) the nature and length of the professional relationship with the client;

7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Id.* (quoting Tex. Disciplinary R. Prof'l Conduct R. 1.04, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2013) (Tex. State Bar R., art. X, § 9)). National asserts that Cashiola's testimony was legally insufficient to prove *Arthur Andersen* factors one, four, and eight. A party need not prove all of the *Arthur Andersen* factors for the evidence supporting an attorney's fee award to be sufficient. *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 706 (Tex. App.—Dallas 2008, no pet.).

41

Cashiola testified that the rates charged per hour by appellees' attorneys are reasonable, reflective of the risk of taking the case, and commensurate with the attorneys' skills, and he explained that the rates are reasonable for the area of first-party insurance law, as well as for the Jefferson County area. Cashiola further explained that appellees' attorneys had to travel more after the case was moved to Harris County as part of the MDL procedure. In addition, Cashiola explained that appellees' attorneys would only recover their fees if Lampson won the lawsuit, and "there is no guarantee here of any kind of recovery." Cashiola also testified that appellate attorneys charge approximately $500 per hour, and he used that figure in estimating appellate attorney's fees.

Cashiola testified that appellees' attorneys had created a fee report in spreadsheet format, which reflected their work up to two days before Cashiola's testimony, and the report was admitted into evidence without objection. As previously discussed, Cashiola testified that $160,145 in attorney's fees had been incurred, and he explained that attorney's fees were accruing during trial at the rate of approximately $6000 per day. The fee report lists the services performed, who performed them, the hourly rate for the services, when they were performed, and how much time the work required. On this record, we conclude that the evidence was sufficient to support the attorney's fees awarded. *See Long*, 442 S.W.3d at

42

256; *Olivas*, 370 S.W.3d at 764. Accordingly, we overrule issue seven. Having overruled all of National's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on May 19, 2016
Opinion Delivered December 1, 2016

Before McKeithen, C.J., Kreger and Johnson, JJ.